872 A.2d 783

KENNETH THIEDEMANN, PLAINTIFF, AND BRIAN FLAHERTY AND BARBARA FLAHERTY, HUSBAND AND WIFE, AND YUET LAN LAM, IN THEIR OWN RIGHT AND AS ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS-RESPONDENTS, v. MERCEDES-BENZ USA, LLC, F/K/A MERCEDES-BENZ USA, INC., DEFENDANT-APPELLANT.

Argued January 19, 2005—Decided May 18, 2005.

*Peter W. Herzog, III,* a member of the Missouri and Massachusetts bars, argued the cause for appellant (*Graham, Curtin & Sheridan,* attorneys; *Thomas R. Curtin* and *Kathleen N. Fennelly,* of counsel; *Mr. Curtin, Ms. Fennelly, Mr. Herzog* and *James F. Bennett,* a member of the Missouri and Illinois bars, on the briefs).

*Kevin P. Roddy,* a member of the California, New York and Virginia bars, argued the cause for respondents (*Wilentz, Goldman & Spitzer,* attorneys; *Jeffrey J. Brookner, Lynne M. Kizis* and *Barry R. Sugarman,* of counsel; *Mr. Sugarman, Ms. Kizis, Mr. Brookner* and *Jennifer Sarnelli,* on the briefs).

*Donna Siegel Moffa* submitted a brief on behalf of *amici curiae,* AARP and National Consumer Law Center (*Trujillo, Rodriquez & Richards* and *PinilisHalpern,* attorneys; *Ms. Moffa* and *William J. Pinilis,* on the brief).

*Anita R. Hotchkiss* submitted a brief on behalf of *amicus curiae* Product Liability Advisory Council (*Porzio, Bromberg & Newman,* attorneys; *Ms. Hotchkiss, Linda Pissott Reig* and *David C. Uitti,* on the brief).

Justice LaVECCHIA delivered the opinion of the Court.

The New Jersey Consumer Fraud Act (CFA), *N.J.S.A.* 56:8–1 to –20, authorizes a private cause of action when a plaintiff has suffered an "ascertainable loss of moneys or property, real or personal" as a result of a practice in violation of the CFA. *N.J.S.A.* 56:8–19. This appeal focuses on the enigmatic requirement of an "ascertainable loss" and, specifically, on what a plaintiff must demonstrate in order to survive a motion for summary judgment when challenged on that issue. We hold that when a plaintiff fails to produce evidence from which a finder of fact could find or infer that a plaintiff suffered a quantifiable or otherwise measurable loss as a result of the alleged CFA unlawful practice, summary judgment should be entered in favor of defendant, as the trial court here correctly held. We therefore reverse the contrary judgment of the Appellate Division. *Thiedemann v. Mercedes–Benz USA, LLC,* 369 *N.J.Super.* 402, 849 *A.*2d 196 (App.Div.2004).

## I.

### A.

Plaintiff Kenneth Thiedemann[1] filed this matter as a class action against defendant Mercedes–Benz USA.[2] The complaint

[1] Thereafter Thiedemann sought to be released as plaintiff to pursue his preference for a remedy under the New Jersey Lemon Law Act, *N.J.S.A.* 56:12–29 to –49. Brian and Barbara Flaherty and Yuet Lan Lam were substituted as the class representatives.

[2] Mercedes–Benz USA is responsible for overseeing the sales, service, and marketing of Mercedes–Benz products in the United States. Incorporated under the laws of Delaware, defendant's headquarters are located in Montvale, New Jersey.

asserted that the fuel sending units in certain Mercedes–Benz vehicles contained a serious and hazardous latent design defect resulting in (1) violation of the CFA; (2) breach of the implied warranty of merchantability under *N.J.S.A.* 12A:2–314; and (3) violation of Section Ten of the Magnuson–Moss Warranty–Federal Trade Commission Improvement Act, 15 *U.S.C.A.* §§ 2301 to 2312. Allegedly eight models of Mercedes–Benz automobiles manufactured between the years of 1998 and 2000 contained defective fuel sending units, which would cause the dashboard fuel gauge to reflect inaccurately the amount of gasoline in the fuel tanks and place consumers at risk of "sudden, unexpected, and dangerous operational failure of their automobiles" due to the "sudden, unexpected, and dangerous depletion of fuel." Plaintiffs contended that defendant was aware of the defect, but did not make owners and lessees aware of it and, more specifically, that defendant "knowingly concealed, suppressed, and omitted to disclose the fuel sending unit defect, with the intent that others rely upon such concealment."

Plaintiff moved for class certification. Defendant opposed this motion, and also moved for dismissal of the individual claims of the putative class representatives. Although defendant admitted during discovery that there were 43,039 fuel sending unit failures prior to August 28, 2001, in several 1998-2000 vehicle models, it nevertheless contended that the company's actions to repair and replace problem units, taken in compliance with its warranty program, eliminated any loss for plaintiffs.[3] Accordingly, defendant asserted that because the plaintiffs failed to demonstrate an "ascertainable loss" that was prerequisite to their right to a

---

[3] According to defendant, the failures were grouping heavily in certain locales within North America (*i.e.*, California, Canada) and yet curiously were absent in their European market, suggesting a likely connection between the gasoline mixture used in vehicles in those various regions and its effect on the unit over time. Other causal conditions also were postulated as defendant responded to consumer complaints. In any event, the fuel sending units were repaired or replaced when and if problems arose. No recall was issued by defendant or requested by any regulatory authority.

private CFA action, plaintiffs' CFA claim must be dismissed. Defendant asserted further that because plaintiffs failed to present a *prima facie* CFA claim, the other claims under the Uniform Commercial Code or the Magnuson–Moss Warranty–Federal Trade Commission Improvement Act failed as well. The trial court granted judgment to defendant; however, the Appellate Division reversed and reinstated plaintiffs' complaint. *Thiedemann, supra,* 369 *N.J.Super.* at 414, 849 *A.*2d 196. We granted certification, 181 *N.J.* 547, 859 *A.*2d 692 (2004), to review whether plaintiffs had made out a case that could withstand defendant's motion for summary judgment in respect of the issue of ascertainable loss. In that review, the non-movant plaintiffs shall receive all reasonable and favorable inferences that the record can support. *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 536, 666 *A.*2d 146 (1995).

### B.

In September 1999, Brian and Barbara Flaherty, New York residents, purchased a 1999 Mercedes–Benz C–280 from Helms Brothers Mercedes in Bayside, New York. They experienced difficulties with inaccurate fuel gauge readings and, on at least two occasions, ran out of fuel while driving. They filed a lawsuit against Mercedes–Benz under the Pennsylvania Automobile Lemon Law, *Pa. Stat. Ann.* tit. 73, § 1951, that settled when the Flahertys agreed to release their claims as part of a key-for-key exchange of the 1999 C–280 for a newer model vehicle. Thus, they turned in the 1999 Mercedes–Benz C–280 and received the newer 2000 model at no additional out-of-pocket cost and subject to the same financing terms as the 1999 vehicle, including credit for all payments made to date on the older vehicle. Mr. Flaherty conceded in this matter that he did not pay for the cost of repairs or for the loaner cars that were provided to him in connection with the 1999 Mercedes–Benz.

Unfortunately, the Flahertys began to experience inaccurate fuel gauge readings with their newer C–280 model. After defen-

dant made several repair attempts, the Flahertys were offered the opportunity to trade in their C–280 for a new Mercedes–Benz E–320. Although the 2000 Mercedes–Benz C–280 had 7,500 miles on its odometer, defendant agreed to value the vehicle as if it were new. Thus, an agreement was reached that permitted the Flahertys to upgrade their used vehicle by paying the difference in price between the Manufacturer's Suggested Retail Price for a new C–280 and for a new E–320. As with their 1999 vehicle, they incurred no out-of-pocket expenses in connection with the warranty repairs made to the 2000 Mercedes–Benz C–280 and they received a free loaner car whenever their vehicle was being repaired.

Notwithstanding the new make and model of their Mercedes Benz vehicle, the Flahertys again began to notice inaccurate fuel gauge readings. Unlike their earlier experiences when their vehicle's fuel gauge did not detect an empty tank, the E–320 fuel gauge would not disclose a reading above three-fourths of a tank even when the fuel tank was full. Mercedes–Benz repaired the problem in accordance with its warranty program and the motion record reveals that since then the Flahertys have not reported another fuel-sensor problem.

Plaintiff Yuet Lan Lam had a like experience with defendant in respect of warranty repairs to her vehicle. She leased a Mercedes–Benz ML–430 from Prestige Motors Inc. in Paramus, New Jersey in October 1999. The lease was for three years with a fixed end, at which time she would be required to turn in the vehicle unless she exercised the vehicle purchase option under the lease. According to Lam, on four occasions (once in April 2000, twice in November 2000, and once in February 2001), her vehicle stalled and she had to bring it to defendant for repairs that were covered by vehicle warranty.[4] In respect of the incidents in

---

[4] Lam acknowledges that the actual warranty work was performed at defendant's expense; however, she claims a "loss" in that she was required to pay a total of fifty-seven dollars for fuel used by defendant's technicians during diagnostics on the vehicle.

November 2000 and February 2001, when Lam's car stalled she was able to restart it and drive away. She also conceded that she had filled her tank just prior to the latter incident. Apparently a misreading of an empty fuel tank was not the cause. Nonetheless, she asserts that those episodes of stalling occurred because of the same defective condition in the fuel-sending unit that caused the problems experienced by the Flahertys. She produced in support two repair invoices provided by defendant in connection with the warranty work although one, dated November 21, 2000, states that the vehicle's stalling problem was caused by a faulty fuel pump and the second, dated December 11, 2000, states that work was performed on the fuel injection control module.

We note that defendant disputes that the cause of Lam's stalling problem was related to her vehicle's fuel gauge and proffered its engineering expert's opinion that the cause was a malfunctioning electrical system. Because of the summary judgment context, however, we assume the facts in Lam's favor. The reason notwithstanding, since Lam's car last stalled, defendant has repaired the vehicle and the problem has not recurred. Moreover, as with the Flahertys, each time she presented her vehicle to defendant for diagnostics and repair, the warranty work was performed at no cost to her and she received a free loaner car for interim use.

The Mercedes–Benz warranty that was provided with the lease or purchase of the new vehicles involved in this action covers forty-months or 50,000 miles, whichever comes first. It declares that "[Mercedes–Benz's] intention is to repair under warranty, without charge to you, anything that goes wrong with your car during the warranty period which is [Mercedes–Benz's] fault." Defendant adhered to the terms of its warranty in respect of plaintiffs' vehicles and performed the repairs at no expense to the plaintiffs. Accordingly, it contended that plaintiffs had failed to demonstrate any objectively verifiable damages associated with the problematic fuel gauge units and that therefore all three of plaintiffs' causes of action should be dismissed.

As noted, the trial court dismissed the complaint.[5] We set forth in full the court's reasoning:

> Defendant maintains that each time the plaintiffs encountered a problem related to fuel with their vehicles, the problem was repaired at no cost to plaintiffs. Furthermore, the Flahertys have not endured a fuel-related problem since March 2001 and Lam has not endured such a problem since February 2001. None of the plaintiffs [have] spent a single penny in relation to the fuel system problems they experienced. Nevertheless, plaintiffs attribute to themselves as a species of damages, an *unincurred* cost of repair extrapolated from *defendant's* internal warranty remediation efforts. Plaintiffs further assert an inchoate and unsubstantiated loss of the benefit of the bargain. Plaintiffs insist that they did not get what they bargained for and instead received an unsafe motor vehicle with a known fuel-reporting defect. Essentially, what plaintiffs urge here is that they are entitled to a Mercedes–Benz motor vehicle without any flaws or glitches, without any reasonably-remediable problems, and without any of the ordinary tribulations of automobile ownership or lease: in other words, a perfect car unaffected by the laws of physics and common sense. Plaintiffs are not so entitled, and they may not seek legal remedies because of their unrealistic disappointment. If plaintiffs' position were to be sustained—that is, their subjective and intangible disenchantment be translated into legally recoverable damages—it would severely impair the working relationship among automobile manufacturers, distributors, and consumers and undermine the efficacy of the very warranties consumers have fought so hard to obtain and protect. Here, defendant has honored every warranty claim made by plaintiffs and has made their motor vehicles fully operational with minimal consumer travail. Is not that the way the consumer society is supposed to work? The record in this case discloses nothing more than an efficiently operating consumer-complaint and remediation system. To allow plaintiffs any remedies in this case—on this record—would interrupt and distort that system.
>
> Within each of plaintiffs' theories[,] damages are an essential element that must be proved to the satisfaction of the trier of the facts. For purposes of analysis, the least searching and most indulgent standard that plaintiffs must satisfy is the notion of an ascertainable loss within the meaning of the New Jersey Consumer Fraud Act. Here, no rational fact finder could conclude that plaintiffs suffered an objectively ascertainable loss or damage, even under the lens of the expansively protective legislative purpose of the Consumer Fraud Act and this State's public policies affording broad protection to consumers against deceptive commercial practices.

---

5 The trial court bifurcated discovery into "merits discovery" and "class-maintainability discovery." Because merits discovery had not concluded, plaintiff objected to the motion for summary judgment as premature. The trial court was persuaded otherwise, however, by defendant's argument that plaintiffs did not require discovery from defendants in order to fill out the critical gap that existed in plaintiffs' damages claim.

* * *

The motion record contains neither expert proof of diminution of value of any of plaintiffs' property or objective expectations, nor evidence of their out-of-pocket expenses causally connected with the claimed defect perpetrated by defendant. Plaintiffs' situations are quite unlike the circumstances of the plaintiff in *Cox v. Sears Roebuck & Co.*, 138 *N.J.* 2 [647 *A.*2d 454] (1994)[,] where Cox's kitchen remained unrepaired throughout the entire dispute, unlike here, where each plaintiff received a warranted full remediation effort and each motor vehicle's fuel-reporting system has been problem-free for well over a year.

In *Union Ink Co., Inc. v. AT & T Corp.*, 352 *N.J.Super.* 617 [801 *A.*2d 361] (App.Div.2002)[,] the low threshold for determining the existence of an ascertainable loss was not further reduced or eliminated. "[ ]Of course, in order to recover damages, a victim of consumer fraud must prove an [']ascertainable loss,['] *N.J.S.A.* 56:8–19, but that requirement has been broadly defined as embracing more than a monetary loss. An ascertainable loss occurs when a consumer receives less than what was promised.[ ]" *Id.* at [646, 801 *A.*2d 361]. This lack of fulfillment still must be objectively ascertained and is not defined by the subjective wants of plaintiffs. In this case, plaintiffs have offered little other than that they thought they were entitled to an everlastingly accurate fuel gauge. That defendant was briefly unable to satisfy plaintiffs' expectations is insufficient, even under New Jersey's consumer-friendly skies, to trigger liability. If plaintiffs cannot surmount the ascertainable loss threshold for purposes of the Consumer Fraud Act, they similarly cannot overcome the missing element of damages in their non-class action claims under the Uniform Commercial Code and Magnuson–Moss.

The stark reality of the dispute in this case reveals a rather mundane series of events: plaintiffs endured some early problems with the fuel systems in their cars; the problems were addressed and resolved; and plaintiffs encountered no ascertainable loss or damage. Accordingly, defendant's motion for summary judgment is granted.

On appeal, plaintiffs advanced two theories of loss, the first of which the Appellate Division rejected. *Thiedemann, supra*, 369 *N.J.Super.* at 411–12, 849 *A.*2d 196. The panel found unavailing plaintiffs' contention that the cost of repair to their vehicles could serve as a theory of their loss. *Ibid.* That cost had been incurred by defendant only and plaintiffs had not quantified any amounts they spent or would have to spend for possible future repairs. *Ibid.* However, plaintiffs' second argument succeeded in persuading the court that "[the] proofs sufficiently established the likelihood of an ascertainable loss for summary judgment purposes." *Id.* at 413, 849 *A.*2d 196. The court stated that the mere possibility that the fuel gauge defect may be present in replacement parts used in the repair of plaintiffs' vehicles rendered it likely that the

problem could recur. *Ibid.* The panel further took judicial notice of the likelihood that if the Flahertys were to advise a future buyer of their vehicle about the potential defect in the fuel sending unit's replacement parts, the Flahertys would receive less than if the defect was not present. *Ibid.* The court concluded that "common knowledge, indeed common sense, compels a conclusion that the value of the vehicle is impaired to a measurable, if presently unknowable degree." *Ibid.*

## II.

■ The Legislature enacted the CFA in 1960 to address rampant consumer complaints about fraudulent practices in the marketplace and to deter such conduct by merchants. *Furst v. Einstein Moomjy, Inc.*, 182 *N.J.* 1, 11, 860 *A.*2d 435 (2004) (citing *Cox v. Sears Roebuck & Co.*, 138 *N.J.* 2, 21, 647 *A.*2d 454 (1994)). As explained in *Cox, supra,* the CFA sets forth three general categories of unlawful acts: (1) affirmative acts; (2) knowing omissions; and (3) regulatory violations. 138 *N.J.* at 17, 647 *A.*2d 454. This matter concerns the first of those categories.

■ "Affirmative acts" were defined as unlawful practices that include unconscionable commercial practices, fraud, deception, false promise, false pretense, and misrepresentation. *N.J.S.A.* 56:8–2. *See Miller v. Am. Family Publishers,* 284 *N.J.Super.* 67, 75, 663 *A.*2d 643 (Ch.Div.1995). In respect of such violations, intent is not a required element. *N.J.S.A.* 56:8–2. An "affirmative act" may be established by showing that a defendant's actions constituted one of the stated prohibited practices. *See Cox, supra,* 138 *N.J.* at 17–18, 647 *A.*2d 454.

It is a well-known fact that the CFA initially conferred enforcement power exclusively on the Attorney General. *See Weinberg v. Sprint Corp.,* 173 *N.J.* 233, 247–48, 801 *A.*2d 281 (2002) (citations omitted). The Legislature armed the Attorney General with broad investigatory powers and the authority to seek injunctive and other relief necessary to make whole victims damaged by acts made unlawful under the CFA. *Ibid.* (discussing statutory powers

and authority conferred). *See also Meshinsky v. Nichols Yacht Sales, Inc.*, 110 *N.J.* 464, 472–73, 541 *A.*2d 1063 (1988) (noting Attorney General's unbridled enforcement authority does not require proof of damages, thereby advancing CFA's protectionist purpose).

To augment the Attorney General's enforcement efforts, the CFA was amended, after a decade's worth of experience, to add a private right of action. *L.* 1971, *c.* 247, § 7. The private action allows a successful plaintiff to recover treble damages, reasonable attorneys' fees, and the fees and costs associated with filing suit. As codified, *N.J.S.A.* 56:8–19 provides that

[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act or the act hereby amended and supplemented may bring an action or assert a counterclaim therefor in any court of competent jurisdiction. In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section, including those brought by the Attorney General, the court shall also award reasonable attorneys fees, filing fees and reasonable costs of suit.

■ The 1971 amendment advanced the CFA's purposes by compensating victims for actual losses, punishing wrongdoers through awards of treble damages, and offering an incentive for attorneys to take a case even when only a relatively small loss may be involved. *Wanetick v. Gateway Mitsubishi*, 163 *N.J.* 484, 490, 750 *A.*2d 79 (2000) (citing *Lettenmaier v. Lube Connection, Inc.*, 162 *N.J.* 134, 139, 741 *A.*2d 591 (1999)). However, as noted in *Meshinsky, supra*, 110 *N.J.* at 473, 541 *A.*2d 1063, additional proofs are required for a private cause of action above those imposed on the Attorney General. As a prerequisite to the right to bring a private action, a plaintiff must be able to demonstrate that " 'he or she suffered an 'ascertainable loss . . . as a result of' the unlawful conduct.' " *Weinberg, supra*, 173 *N.J.* at 237, 801 *A.*2d 281 (citations omitted). The limiting nature of the requirement allows a private cause of action only to those who can demonstrate a loss attributable to conduct made unlawful by the CFA. *Meshinsky, supra*, 110 *N.J.* at 473, 541 *A.*2d 1063 (citing

*Daaleman v. Elizabethtown Gas Co.,* 77 *N.J.* 267, 271, 390 *A.*2d 566 (1978)). When last we were asked to ignore the statutory distinction between CFA actions brought by the Attorney General and the actions a private plaintiff may bring, and to abrogate the requirement of an ascertainable loss for a private suit, we declined. *See Weinberg, supra,* 173 *N.J.* at 250–51, 801 *A.*2d 281 (stating "[i]n effect, the Act permits only the Attorney General to bring actions for purely injunctive relief").

█ That said, undergirding *Weinberg's* analysis was the understanding that the *prima facie* proofs necessary for a private cause of action under the CFA must be applied compatibly with the CFA's remedial nature. *See id.* at 251, 801 *A.*2d 281. Thus, *Weinberg* established that in order to proceed with a CFA claim, a private plaintiff only need present a *bona fide* claim for an ascertainable loss, defined as a loss that is capable of withstanding a motion for summary judgment because it "raises a genuine issue of fact requiring resolution by the factfinder." *Id.* at 253, 801 *A.*2d 281. Stated differently, a plaintiff may be able to proffer proof of a loss that, although disputed, nonetheless would be sufficient to send the matter to the factfinder. *Id.* at 251, 801 *A.*2d 281. Although the proof may not be accepted ultimately by the trier of fact for a host of reasons (and, thus, the plaintiff ultimately may not succeed in garnering an award of damages), that possibility does not render the plaintiff without standing to pursue the private CFA cause of action. *Ibid. Weinberg* held that it is not only the "plaintiff who successfully *proves* ascertainable loss [who] may have access to the [CFA's] remedies of equitable relief and attorneys' fees." *Ibid.* (emphasis added).[6]

---

[6] Application of the *Weinberg* rule to its facts led to dismissal of the action because the plaintiff class, as a matter of law, could not demonstrate that it suffered any cognizable loss in respect of the pre-paid telephone charges in issue. *Weinberg, supra,* 173 *N.J.* at 254, 801 *A.*2d 281 (holding filed rate doctrine could not result in any actionable loss to plaintiffs because rates charged were in accordance with tariffs).

### III.

### A.

■ There is little that illuminates the precise meaning that the Legislature intended in respect of the term "ascertainable loss" in our statute. *See Furst, supra,* 182 *N.J.* at 11, 860 *A.*2d 435 (stating that "[w]e neither can ascribe a plain meaning to the term ascertainable loss, nor find legislative history that sheds direct light on those words"). "Ascertain" is defined as "to make (a thing) certain; establish as a certainty; determine with certainty;" and "ascertainable," the adjective, is similarly defined as "capable of being ascertained." *Webster's Third New International Dictionary* 126 (1981). To give effect to the legislative language describing the requisite loss for private standing under the CFA, and to be consistent with *Weinberg,* a private plaintiff must produce evidence from which a factfinder could find or infer that the plaintiff suffered an actual loss. At the time of summary judgment that evidence must be sufficient to present a genuine issue for the factfinder.

■ In cases involving breach of contract or misrepresentation, either out-of-pocket loss or a demonstration of loss in value will suffice to meet the ascertainable loss hurdle and will set the stage for establishing the measure of damages. *See, e.g., Furst, supra,* 182 *N.J.* at 13, 860 *A.*2d 435 (applying loss in value to consumer in breach of contract case). That said, a claim of loss in value must be supported by sufficient evidence to get to the factfinder. To raise a genuine dispute about such a fact, the plaintiff must proffer evidence of loss that is not hypothetical or illusory. It must be presented with some certainty demonstrating that it is capable of calculation, although it need not be demonstrated in all its particularity to avoid summary judgment.

■ The certainty implicit in the concept of an "ascertainable" loss is that it is quantifiable or measurable. Moreover, it need not yet have been experienced as an out-of-pocket loss to the plaintiff. *See, e.g., Cox, supra,* 138 *N.J.* at 22–23, 647 *A.*2d 454

(noting that to demonstrate "loss" victim need not have actually spent money to perform repairs to correct defendant's errors in performing kitchen renovation). An "estimate of damages, calculated within a reasonable degree of certainty" will suffice to demonstrate an ascertainable loss. *Id.* at 22, 647 *A.*2d 454. We can envision the possibility that an expert may be able to speak to a loss in value of real or personal property due to market conditions, with sufficient precision to withstand a motion for summary judgment. However, by the time of a summary judgment motion, it is the plaintiff's obligation to be able to make such a demonstration or risk dismissal of the cause. The plaintiffs in *Weinberg* could not meet the required threshold necessary to vault a motion for summary judgment—namely, they could not demonstrate a cognizable and calculable claim of loss due to the alleged CFA violation. *Supra,* 173 *N.J.* at 254, 801 *A.*2d 281. The question here is whether the instant plaintiffs have presented a claim that should be permitted to proceed before the finder of fact.

### B.

According to plaintiffs, there is a distinction between a loss that is ascertainable and one already ascertained. Plaintiffs claim that Mercedes–Benz owners who drive their vehicles without knowledge of the defect in the fuel sending unit have not ascertained any "loss," but with class action assistance and further discovery, those owners could discern their "loss," and thus the loss must be considered to be "ascertainable." To the extent that plaintiffs further contend that such class members should not be deprived of CFA's injunctive remedies and of a fee award even if their loss is unquantifiable, plaintiffs' argument squarely conflicts with our past holdings that recognized a distinction between private CFA causes of action and those that may be brought by the Attorney General. *See Weinberg, supra,* 173 *N.J.* at 250, 801 *A.*2d 281; *Cox, supra,* 138 *N.J.* at 21, 647 *A.*2d 454; *Meshinsky, supra,* 110 *N.J.* at 473, 541 *A.*2d 1063.

Plaintiffs alternatively posit that they can present a loss that is quantifiable. Their claimed loss is measurable, they say, by the cost of designing and installing into each class member's vehicle a fuel sending unit free of defects, or by the cost of a single repair, multiplied by the expected number of repairs over the life of an average vehicle, or by assessing the reduced value of plaintiffs' vehicles due to the fuel sending unit defect. As to the last of these methods, plaintiffs assert that no class member should have to actually sell his or her vehicle—the theoretical asserted loss in value should suffice. The Appellate Division decision accepted that latter argument, notwithstanding that it was unsupported by any proffer of lay or expert evidence. The panel found that a "likely," albeit hypothetical, future loss in value could arise due to the possibility that the defect would reemerge in replacement parts used in warranty repairs on the class representatives' vehicles and that that hypothetical future loss met the required demonstration of "ascertainable loss." *Thiedemann, supra,* 369 *N.J.Super.* at 413–14, 849 *A.*2d 196.

Defendant Mercedes–Benz and *amicus curiae,* the Product Liability Advisory Council (PLAC),[7] argue that the Appellate Division decision conflicts with established law. They refer to the case law enforcing the legislative distinction between those CFA actions that may be brought by private individuals who actually experience a loss due to a consumer fraud violation, and the broader category of actions that may be brought by the Attorney General, which encompasses circumstances where there is no ascertainable loss to an individual but there exists an industry practice that the State seeks to curtail. Mercedes–Benz adds that it would be a mistake to eviscerate the ascertainable loss requirement for a private cause of action because that could deter companies that have been proactive in advancing consumer protectionism through the provision of broad warranty programs. Indeed, both defendant and PLAC contend that the CFA implicitly

---

[7] PLAC is a non-profit association with over 130 corporate members representing American and international product manufacturers.

encourages merchants, and specifically automobile sellers, to initiate pro-consumer warranty programs by rewarding those companies with the benefit of avoiding CFA exposure for claims brought by individuals who do not incur an out-of-pocket loss.

## C.

■ Defendant and PLAC have the better of the arguments in this matter. The ascertainable loss requirement operates as an integral check upon the balance struck by the CFA between the consuming public and sellers of goods. The importance of maintaining that balance is obvious. Defects can, and do, arise with complex instrumentalities such as automobiles. The mere fact that an automobile defect arises does not establish, in and of itself, an actual and ascertainable loss to the vehicle purchaser. Indeed, the warranty provided as part of the contract of sale or lease is part of the benefit of the bargain between the parties. The defects that arise and are addressed by warranty, at no cost to the consumer, do not provide the predicate "loss" that the CFA expressly requires for a private claim under the CFA, bringing with it the potential for treble damages, attorney's fees, and court costs and fees.

Defendant aptly describes the effect of plaintiffs' contrary argument—namely, that of deterring any salutary efforts exerted by automobile merchants to address voluntarily and responsibly defects that may arise post-sale. We do not wish to discourage self-improvement in the consumer goods industry. The remedial purposes of the CFA are not advanced by foregoing the statute's added starter—that of requiring demonstration of a loss that is capable of being determined with certainty—the ascertainable loss prerequisite to a private cause of action. Examination of the proofs advanced in respect of the purported class representatives reveals that neither present any such quantifiable or otherwise measurable loss.

■ In respect of the Flaherty plaintiffs, we do not doubt that they were inconvenienced by problems caused by the defective

fuel gauge sensors in their vehicles. Nonetheless, the problems caused by the defective sensors did not result in any out-of-pocket monetary loss to plaintiffs. All repairs were performed by defendant under warranty, at no cost to the Flahertys, and the loaner vehicles were provided during periods when the Flahertys' car was being repaired.

The argument (and that is all that is proffered on this record) that there is a future hypothetical diminution in value in the E–320 due to a fuel gauge that at one time did not read properly a *full* tank of gasoline, is too speculative to satisfy the CFA requirement of a demonstration of a quantifiable or otherwise measurable loss as a condition of bringing a CFA suit. The Flahertys made no attempt to sell their vehicle. Nor did they present any expert evidence to support an inference of loss in value notwithstanding the lack of any attempt to sell the vehicle, *i.e.*, that the resale market for the specific vehicle had been skewed by the "defect." The absence of any such evidence, presented with a sufficient degree of reliability to permit the trial court, acting as gatekeeper, to allow the disputed fact to proceed before a jury, was fatal to plaintiffs' claim.

We are not persuaded as to the correctness or appropriateness of the Appellate Division's resort to common knowledge or common sense to provide the needed additional support for plaintiffs' claim of loss of benefit-of-the-bargain based on a vehicle problem that required warranty service. The warranty program was part of plaintiffs' bargain and it was provided, as required, by defendants. Plaintiffs needed to produce specific proofs to support or infer a quantifiable loss in respect of their benefit-of-the-bargain claim; subjective assertions without more are insufficient to satisfy the requirement of an ascertainable loss that is expressly necessary for access to the CFA remedies.[8] The trial court in

---

[8] We do not suggest that a benefit-of-the-bargain claim cannot support an ascertainable loss sufficient to allow a CFA claim to proceed to the factfinder; rather, it is the quality of the proofs that will determine a claim's viability.

this matter correctly assessed the quality of proofs in respect of this claim and found them wanting.

 Lam's failure to present adequately as a viable class representative is more fundamental. Assuming, without agreeing, that her vehicle's problems were attributable to a defective fuel gauge, she too had no out-of-pocket loss attributable to that alleged defect. We refuse to conclude that her payment for the gas used during technicians' efforts to diagnose her car's problem constituted a "loss" of the sort that would support a CFA private claim in this setting. That claim of "loss" is simply unreasonable. Moreover, because she leases her vehicle and does not own it, she is unable to advance an argument that she might be able to demonstrate loss in future resale value due to alleged, potentially defective replacement parts, assuming some proof to support that claim. At the end of the lease, the party who receives back the leased vehicle is the one that arguably receives a vehicle having some diminution in future value. Again, we agree with the

Sufficient proof of an ascertainable loss in respect of the "lost bargain" was present, for example, in *Talalai v. Cooper Tire & Rubber Co.*, 360 *N.J.Super.* 547, 562–63, 823 *A.2d* 888 (Law Div.2001) (finding *prima facie* presentation of ascertainable loss in CFA claim based on loss of bargain where defendant allegedly was producing defective tires and removing visible evidence of defects, requiring plaintiffs either to pay for expert examination of safety of tires or for replacement tires), and *Miller v. American Family Publishers, supra,* 284 *N.J.Super.* at 88–90, 663 *A.2d* 643 (finding sufficient demonstration of ascertainable loss based on loss of bargain where plaintiffs were deceived into believing they were purchasing both magazine subscription and participation in defendant's sweepstakes with enhanced likelihood of winning, but purchases were unrelated to sweepstakes). To the extent that plaintiffs note the acceptance of other benefit-of-the-bargain *prima facie* claims, they include matters that involved causes of action different from the CFA, with its "ascertainable loss" requirement. *See, e.g., In re Cadillac V8–6–4 Class Action,* 93 *N.J.* 412, 423, 461 *A.2d* 736 (1983)(common law fraud); *Berrie v. Toyota Motor Sales, USA, Inc.,* 267 *N.J.Super.* 152, 154, 630 *A.2d* 1180 (App.Div.1993) (Lemon Law claim); *General Motors Acceptance Corp. v. Jankowitz,* 216 *N.J.Super.* 313, 320–21, 523 *A.2d* 695 (App.Div.1987) (Magnuson–Moss Act). That difference aside, the records in the aforementioned cases revealed evidence that the defective conditions in the motor vehicles in dispute were ongoing either because the defect could not be remedied or the manufacturer or dealer refused to correct the condition.

reasoning of the trial court and conclude that Lam did not demonstrate a *prima facie* CFA cause of action. In sum, the trial court correctly dismissed the individual claims of putative class representatives.

## IV.

The CFA is not the only remedy available to automobile consumers. There is also the New Jersey Lemon Law Act, *N.J.S. A.* 56:12–29 to –49 (Lemon Law). Finding that "the purchase of a new motor vehicle is a major, high cost consumer transaction and [that] the inability to correct defects in these vehicles creates a major hardship and an unacceptable economic burden on the consumer," in 1988 the Legislature enacted the New Jersey Automobile Lemon Law

> to require the manufacturer of a new motor vehicle to correct defects originally covered under the manufacturer's warranty ... [,] to provide procedures to expeditiously resolve disputes between a consumer and a manufacturer when defects in a new motor vehicle are not corrected within a reasonable time, and to provide ... specific remedies where the uncorrected defect substantially impairs the use, value, or safety of the new motor vehicle.
>
> [*N.J.S.A.* 56:12–29.]

To effectuate those goals, "[i]f a consumer reports a nonconformity in a motor vehicle to the manufacturer or its dealer during the first 18,000 miles of operation or during the period of two years following the date of original delivery to a consumer," the manufacturer is required to make all of the necessary repairs. *N.J.S.A.* 56:12–31. The manufacturer then has three attempts or a cumulative total of 20 calendar days, whichever occurs first, to repair the nonconforming vehicle. *N.J.S.A.* 56:12–33. If the manufacturer is unable to repair the vehicle within the statutory timeframe, the consumer is entitled to a full refund of the purchase price of the vehicle in addition to "any other charges or fees" associated with the ownership of the vehicle. *N.J.S.A.* 56:12–32.

Thus, the Legislature has provided more than one remedy in respect of automobile defects. Our obligation is to weave those remedies together sensibly, a task that is easily accomplished.

We can reconcile the complementary remedial schemes by adhering to the requirement that a private CFA plaintiff demonstrate a real and measurable loss of property or moneys to have standing to pursue a CFA action. Indeed, the two statutory schemes would be in conflict if the CFA were to accept as proof of an "ascertainable loss" the occurrence of a defect in an automobile, even when the defect is addressed by the manufacturer or dealer at no cost to the purchaser pursuant to a warranty program, when the Lemon Law will allow a car manufacturer three opportunities to cure a defect pursuant to a warranty program before the Lemon Law remedies attach. The Lemon Law encourages voluntary remedial programs and establishes minimally what an automobile manufacturer must do. We will not render that scheme meaningless by allowing a CFA private cause of action without proof of a real and demonstrable loss to the plaintiff.

In sum, the CFA private plaintiff must produce some specific proof to demonstrate a discernable loss. Thus implemented, the CFA ascertainable loss requirement will allow advancement of the respective purposes of the dual statutory schemes.

## V.

The judgment of the Appellate Division is reversed and the matter is remanded to the trial court for entry of judgment in favor of defendant.

*For reversal and remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, WALLACE and RIVERA–SOTO—6.

*Opposed*—None.