136 A.3d 447

MICHAEL FERGUSON, BENJAMIN UNGER, SHELDON BRUCK, CHAIM LEVIN, JO BRUCK, BELLA LEVIN, PLAINTIFFS, v. JONAH (JEWS OFFERING NEW ALTERNATIVES FOR HEALING F/K/A JEWS OFFERING NEW ALTERNATIVES TO HOMOSEXUALITY), ARTHUR GOLDBERG, ALAN DOWNING, ALAN DOWNING LIFE COACHING LLC, DEFENDANTS.

Superior Court of New Jersey
Law Division
Hudson County

Decided June 6, 2014.

131

*Bruce D. Greenberg* for plaintiffs (*Lite DePalma Greenberg, LLC*, attorneys).

*David C. Dinielli* of the California bar, and *Samuel E. Wolfe* of the Alabama bar, admitted pro hac vice, for plaintiffs (*Southern Poverty Law Center*).

*Lina Bensman* of the New York bar, admitted pro hac vice, for plaintiffs (*Cleary Gottlieb Steen & Hamilton LLP*).

*Michael P. Laffey* for defendants (*Messina Law Firm*, attorneys).

*Charles S. LiMandri* of the California, New York, and District of Columbia bars, admitted pro hac vice, for defendants (*Freedom of Conscience Defense Fund*).

BARISO, A.J.S.C.

*Introduction*

On November 27, 2012, plaintiffs Michael Ferguson, Benjamin Unger, Sheldon Bruck, Chaim Levin, Jo Bruck, and Bella Levin ("plaintiffs") filed an action against defendants Jews Offering New Alternatives for Healing ("JONAH") and others. JONAH is a nonprofit corporation dedicated to educating the Jewish community about the social, cultural, and emotional factors that lead to same-sex attractions. JONAH uses counseling and other methods to assist individuals to purge unwanted same-sex attractions. Plaintiffs allege that JONAH's business practices violate the New Jersey Consumer Fraud Act ("CFA"), *N.J.S.A.* 56:8–1 to –20.

Plaintiffs' CFA claim is based on two separate forms of ascertainable loss. The first is money spent on JONAH's services. The second is money spent on reparative therapy necessitated by JONAH's services. JONAH has moved for partial summary judgment, asserting that the second category of loss is not recoverable under the CFA.

*Statement of Facts and Relevant Procedural History*

JONAH provided conversion therapy and counseling services purporting to change plaintiffs' sexual orientation from homosexual to heterosexual. JONAH claims that their services are clinical in nature and based on scientific techniques proven to prevent or cure homosexuality. *See JONAH's History,* JONAH, https://www.jonahweb.org/sections.php?secId=11 (last visited June 2, 2014). In addition to offering counseling on homosexuality, JONAH's scope of services includes therapy on other "sexual conflicts," such as "sexual promiscuity, pornography, sexual abuse, pedophilia or pederasty, compulsive masturbation, fetishes, transvestitism, incest, prostitution, emotional dependency, [and] sexual addictions." *Ibid.*

According to plaintiffs, JONAH's conversion therapy required them to engage in various individual and group activities. For instance, during a private session, defendant Alan Downing ("Downing"), a JONAH-affiliated counselor, instructed plaintiff Chaim Levin ("Levin") "to say one negative thing about himself, remove an article of clothing, then repeat the process." *See* Complaint ¶ 45. Levin submitted to Downing's instructions until he was naked, when Downing directed Levin "to touch his penis and then his buttocks." *Ibid.*

Plaintiff Benjamin Unger ("Unger") and plaintiff Michael Ferguson ("Ferguson") engaged in similar disrobing activities with Downing. Downing instructed Unger to remove his shirt in front of a mirror and requested that he "continue," but Unger refused. *Ibid.* In addition, Unger participated in a group exercise in which Downing instructed him and other young men to remove their clothing and stand in a circle naked, with Downing also nude. *Id.* at ¶ 46. As with Unger, Downing instructed Ferguson to undress in front of a mirror and "repeatedly urged [him] to remove additional clothing," but Ferguson refused. *Ibid.*

Other one-on-one activities consisted of counseling clients to spend more time at the gym and to be naked with their fathers at bathhouses. *Id.* at ¶ 54. Downing also instructed Unger to beat

an effigy of his mother with a tennis racket while screaming, as if killing her. *Id.* at ¶ 59. Another JONAH counselor advised plaintiff Sheldon Bruck ("Bruck") to wear a rubber band on his wrist and snap it each time he felt attracted to another man. *Id.* at ¶ 51.

Organized group activities included reenacting scenes of past abuse. For example, Downing instructed Levin to select an individual from the group to role-play his past abuser. The selected participant would repeat statements similar to those his abuser had made, such as "I won't love you anymore if you don't give me blow jobs." *Ibid.*

Another group exercise required participants to hold hands to create a human chain, with one individual standing behind the chain clutching two oranges representing testicles. *Id.* at ¶ 55. Participants took turns standing on the other side of the human chain while being taunted with homophobic slurs. *Ibid.* Many purportedly expressed anger and struggled to break through the human chain to seize the two oranges. *Ibid.*

A different group exercise entailed blindfolding participants while counselors dribbled basketballs and made anti-gay slurs. *Ibid.* Downing also conducted group cuddling sessions with counselors and their younger clients in an effort to reduce or eliminate same-sex attraction. *Id.* at ¶ 60.

As part of its conversion therapy counseling, JONAH advised plaintiffs that being homosexual is loathsome and that homosexuals are more susceptible to loneliness, suicidal thoughts, and contracting HIV/AIDS. *Id.* at ¶ 61.

JONAH typically charged plaintiffs $100 for each individual session, and $60 for each group session. *Id.* at ¶ 43. The cost of these services could exceed $10,000 per year depending on the individual. *Id.* at ¶ 11.

Plaintiffs allege that JONAH engaged in "unconscionable commercial practice, deception, fraud, false pretense, false promise, and misrepresentation[ ]" by claiming that homosexuality is a

mental disorder and, in the face of empirical evidence to the contrary, that same-sex attractions can be reduced or eliminated through therapy. *Id.* at ¶¶ 38–40. Additionally, plaintiffs contend that JONAH advised them that if conversion therapy did not produce the promised results, the blame rested solely with the clients. *Id.* at ¶¶ 38, 42.

Plaintiffs maintain that conversion therapy has been discredited and rejected by mainstream health organizations. *Id.* at ¶ 5. They cite to the American Psychiatric Association for the proposition that "the potential risks of [conversion] therapy are great, including depression, anxiety and self-destructive behavior, since therapist alignment with societal prejudices against homosexuality may reinforce self-hatred already experienced by the patient." *Ibid.* (quoting "Therapies Focused on Attempts to Change Sexual Orientation" *(Reparative or Conversion Therapies): COPP Position Statement,* Am. Psychiatric Ass'n, http://www.psychiatry.org/File% 20Library/Advocacy% 20and% 20Newsroom/Position% 20Statements/ps2000_ReparativeTherapy.pdf.)

Plaintiffs claim that reparative therapy was necessary as a result of JONAH's services. For example, Unger became deeply depressed and suffered an impaired ability to engage in physical and emotional relationships with men because JONAH conditioned him to view such relations as unnatural. *Id.* at ¶ 72. Bruck experienced depression, anxiety, and suicidal thoughts because of his therapy sessions with JONAH. *Id.* at ¶ 95. In short, each plaintiff sought one or more professional mental health counselors following his experience with JONAH. *Id.* at ¶¶ 73, 85, 98, 108. Consequently, plaintiffs submit that money expended for their post-JONAH therapy should be calculated as ascertainable loss under the CFA.

On March 26, 2014, JONAH moved for partial summary judgment, arguing that money expended to treat mental or emotional damages does not constitute an ascertainable loss under the CFA. Following oral arguments on the motion on May 9, 2014, the parties were asked to brief whether *D'Agostino v. Maldonado,* 216

*N.J.* 168, 78 *A.*3d 527 (2013), permits recovery for post-JONAH therapy as "damages sustained," even if it does not constitute "ascertainable loss" under the CFA as JONAH argues.

*Discussion*

I.

*Rule* 4:46–2(c) provides that a court shall render summary judgment only when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." To determine whether there is a genuine issue as to a material fact, the court views the facts in the light most favorable to the nonmoving party. *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 523, 666 *A.*2d 146 (1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 *U.S.* 242, 248, 106 *S.Ct.* 2505, 2510, 91 *L.Ed.*2d 202, 211 (1986).

■ Generally, summary judgment is inappropriate before the completion of discovery, and a litigant should have the opportunity for full exposure of its case. *See Velantzas v. Colgate–Palmolive Co.*, 109 *N.J.* 189, 193, 536 *A.*2d 237 (1988); *Mohamed v. Iglesia Evangelica Oasis De Salvacion*, 424 *N.J.Super.* 489, 498, 38 *A.*3d 669 (App.Div.2012). However, summary judgment may be granted if further discovery will not alter the result. *Minoia v. Kushner*, 365 *N.J.Super.* 304, 307, 839 *A.*2d 90 (App.Div.), *certif. denied*, 180 *N.J.* 354, 851 *A.*2d 648 (2004).

The party presenting a summary judgment motion must provide a statement of material facts containing citations to the record. Specifically,

[t]he statement of material facts shall set forth in separately numbered paragraphs a concise statement of each material fact as to which the movant contends there is no genuine issue together with a citation to the portion of the motion record establishing the fact or demonstrating that it is uncontroverted. The citation shall identify the document and shall specify the pages and paragraphs or lines thereof or the specific portions of exhibits relied on.

[*R.* 4:46–2(a).]

If the nonmoving party does not admit or deny each statement, the moving party's facts are deemed admitted for the purposes of the motion, as set forth in *Rule* 4:46–2(b).

■ As a procedural matter, JONAH failed to submit a statement of material facts as plainly required by *Rule* 4:46–2(a). Acknowledging that deficiency, JONAH concedes "that perhaps the motion should have been designated a motion for partial dismissal" under *Rule* 4:6–2(e), given that it is moving to strike a particular claim based solely on the allegations of plaintiffs' complaint. *See* defendant's reply brief at 3. Notwithstanding these deficiencies, and because JONAH ultimately submitted a statement of material facts with its reply brief in an effort to cure its error, the substance of JONAH's motion will be addressed.

## II.

■ The CFA was enacted in 1960 " 'to combat the increasingly widespread practice of defrauding the consumer.' " *Weinberg v. Sprint Corp.*, 173 *N.J.* 233, 247, 801 *A.*2d 281 (2002) (quoting *Cox v. Sears Roebuck & Co.*, 138 *N.J.* 2, 14, 647 *A.*2d 454 (1994)). Originally, the power to enforce the CFA was vested exclusively with the Attorney General but, in a 1971 amendment, the Legislature supplemented the statute with a private cause of action. *See Id.* at 248, 801 *A.*2d 281; *D'Agostino v. Maldonado, supra,* 216 *N.J.* at 183, 78 *A.*3d 527.

■ The private cause of action operates to "(1) compensate the victim for his or her actual loss; (2) punish the wrongdoer through the award of treble damages; and (3) attract competent counsel to counteract the 'community scourge' of fraud by providing an incentive for an attorney to take a case involving a minor loss to the individual." *Id.* at 183–84, 78 *A.*3d 527 (quoting *Weinberg, supra,* 173 *N.J.* at 249, 801 *A.*2d 281). The CFA specifically provides that

[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent

> that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice....
>
> [*N.J.S.A.* 56:8–2.]

Merchandise, as defined under the CFA, includes "any ... services or anything offered, directly or indirectly to the public for sale." *N.J.S.A.* 56:8–1(c).

 The CFA requires the proof of three elements: an unlawful conduct by defendant; an ascertainable loss by plaintiff; and a causal relationship between the unlawful conduct and the ascertainable loss. *D'Agostino, supra,* 216 *N.J.* at 184, 78 *A.*3d 527. Unlawful conduct can be established through affirmative acts or omissions of any of the violations specified under *N.J.S.A.* 56:8–2, irrespective of intent. *Thiedemann v. Mercedes–Benz USA, LLC,* 183 *N.J.* 234, 245, 872 *A.*2d 783 (2005); *see also D'Agostino, supra,* 216 *N.J.* at 184, 78 *A.*3d 527 (explaining that the CFA "establishes a broad business ethic applied to balance the interests of the consumer public and those of the sellers" (citation and internal quotation marks omitted)).

Plaintiffs contend that JONAH engaged in unconscionable practices, deception, fraud, false promises, and misrepresentations in rendering its services. Insofar as this motion is concerned, JONAH does not contest any alleged unlawful conduct cited by plaintiffs. Rather, the threshold issue is whether plaintiffs' subsequent treatment costs constitute an "ascertainable loss" under the CFA.

 The definition of ascertainable loss and what constitutes ascertainable loss has been subject to considerable litigation and debate. The Supreme Court of New Jersey has recognized that "[t]here is little that illuminates the precise meaning that the Legislature intended in respect of the term 'ascertainable loss' in our statute." *Thiedemann, supra,* 183 *N.J.* at 248, 872 *A.*2d 783; *see also D'Agostino, supra,* 216 *N.J.* at 190, 78 *A.*3d 527 ("Notwithstanding the importance of ascertainable loss, we find sparse

guidance in the statutory text.") It is incumbent on a private plaintiff to present sufficient credible evidence from which a factfinder can find or infer that the plaintiff suffered an actual loss. *Ibid.* That said, the element of ascertainable loss under the CFA must be "quantifiable or measurable." *Id.* at 185, 78 *A.*3d 527 (citation and quotation marks omitted). "To raise a genuine dispute about such a fact, the plaintiff must proffer evidence of loss that is not hypothetical or illusory." *Thiedemann, supra,* 183 *N.J.* at 248, 872 *A.*2d 783.

 This is not to say, however, that an ascertainable loss need be "demonstrated in all its particularity to avoid summary judgment." *Ibid.* Nor is ascertainable loss exclusively limited to an "out-of-pocket loss to the plaintiff." *Ibid.* "An estimate of damages, calculated within a reasonable degree of certainty will suffice to demonstrate an ascertainable loss." *Id.* at 249, 872 *A.*2d 783 (citation and internal quotation marks omitted).

 JONAH characterizes plaintiffs' subsequent treatment costs as damages arising out of emotional distress. It therefore concludes that those damages are non-economic and, thus, not recoverable as ascertainable loss. JONAH relies on *Gupta v. Asha Enterprises LLC,* 422 *N.J.Super.* 136, 27 *A.*3d 953 (App.Div. 2011), in support of its conclusion.

In *Gupta,* the plaintiffs were Hindu vegetarians who filed a CFA claim against a restaurant after it had inadvertently served them meat-filled samosas. *Gupta, supra,* 422 *N.J.Super.* at 141–42, 27 *A.*3d 953. The plaintiffs claimed their ascertainable loss was the cost of a trip to India "to undergo a purification ritual" along the Ganges River following their consumption of the samosas. *Id.* at 149, 27 *A.*3d 953. The Appellate Division rejected their claim for damages because "the cost of cure for an alleged spiritual injury . . . cannot be categorized as either a loss of money or property," particularly since the restaurant furnished an order of conforming samosas to the plaintiffs free of cost. *Ibid.* Hence, no "underlying loss of property" was demonstrated. *Ibid.*

In contrast, plaintiffs assert that their claims for post-JONAH treatment costs are supported by *Cox v. Sears Roebuck & Co.,* *supra,* 138 *N.J.* at 2, 647 *A.*2d 454. The plaintiff in *Cox* contracted with Sears to renovate his kitchen and to install new appliances. *Id.* at 7–8, 647 *A.*2d 454. After performance was complete, the plaintiff filed a CFA claim against Sears because the renovations were substandard and failed to comply with home-repair regulations. *Id.* at 8, 647 *A.*2d 454. Sears counterclaimed for the contract price. *Ibid.* The Supreme Court of New Jersey determined that the plaintiff had proffered sufficient evidence to establish an ascertainable loss based on the poor workmanship of Sears, and held that the proper measure of damages was "the cost of repair" as decided by the jury. *Id.* at 22–23, 647 *A.*2d 454. It held further that the plaintiff could recover the cost of repair as an ascertainable loss, regardless of whether he failed to pay Sears the contract price or failed to repair the damaged kitchen. *Id.* at 23–24, 647 *A.*2d 454.

Plaintiffs similarly contend that reparative treatment and counseling following their receipt of services from JONAH should constitute an ascertainable loss cognizable under the CFA. Their reasoning is based on *Cox's* holding.

This court agrees. It concludes that a categorical denial for recovery of plaintiffs' post-JONAH treatment costs is inappropriate. *Gupta* is distinguishable because the alleged unlawful conduct in respect of the "merchandise" offered in that case was unrelated to mental or emotional counseling. This distinction also renders irrelevant the other cases cited in JONAH's motion; the emotional distress alleged by plaintiffs in each of these cases was a step removed from the product or services rendered. *See Gennari v. Weichert Co. Realtors,* 148 *N.J.* 582, 611, 691 *A.*2d 350 (1997) (holding emotional damages arising out of purchase of a defective home are not recoverable under CFA); *Cole v. Laughrey Funeral Home,* 376 *N.J.Super.* 135, 144–45, 869 *A.*2d 457 (App. Div.2005) (treating emotional injuries arising from misrepresentations by a funeral home to be non-economic).

Without addressing the veracity or science of conversion therapy, the nature of the services JONAH offered was premised on designating homosexuality, and other sexual conflicts, as a mental disorder, and the underlying transaction in this case involved reducing or eliminating same-sex attractions through emotional and mental health counseling. Just as the purchaser of a home is a consumer of a product, the recipient of conversion therapy is a consumer of services. Because, assuming the facts in the light most favorable to Plaintiffs, JONAH's conversion therapy damaged the individuals it was meant "to cure," any subsequent costs of repairing plaintiffs' mental or emotional health are the direct and proximate result of JONAH's actions and, hence, should be borne by JONAH, provided of course that plaintiffs tender evidence both competent and sufficient to establish such damages. "[T]he existence of ascertainable loss resulting from a defendant's CFA violation should be determined on the basis of the plaintiff's position following the defendant's unlawful commercial practice." *D'Agostino, supra,* 216 *N.J.* at 197, 78 *A.*3d 527. Accordingly, the cost of reparative therapy caused by the alleged CFA violations may properly constitute an ascertainable loss under the CFA.

Even if the cost for reparative therapy does not constitute an element of ascertainable loss, that does not end the inquiry; whether the cost of reparative therapy can be calculated as "damages sustained" for purposes of the remedy imposed under the CFA remains. *D'Agostino* is instructive: it reiterated that "ascertainable loss" and "damages sustained" have separate functions under the CFA. *D'Agostino, supra,* 216 *N.J.Super.* at 192, 78 *A.*3d 527.

Ascertainable loss is a prerequisite to determining damages sustained under the CFA. "There is no calculation of 'damages sustained' unless the ascertainable loss requirement is first satisfied." *Ibid.* (quoting *Thiedemann, supra,* 183 *N.J.* at 247, 872 *A.*2d 783). In respect of whether non-economic damages can be recoverable under "damages sustained," *Gennari* explains that

[o]ne reading of the Act is that a party who suffers any ascertainable loss has standing to sue and can recover three times "any and all damages sustained." The alternative, and we believe more appropriate, interpretation is that "damages" are limited to "ascertainable loss." At common-law an injured party could recover only for the injuries sustained. Absent a clear expression of legislative intent changing the common law rule, we are reluctant to read the Act to encompass non-economic losses.

[*Gennari, supra,* 148 *N.J.* at 613, 691 *A.*2d 350.]

To conclude on the basis of this proposition that plaintiff's post-JONAH treatment costs are not recoverable under damages sustained necessarily presumes that such costs are non-economic in nature. Because subsequent treatment costs are quantifiable—based on the amount expended on professional health services—even if these costs do not qualify as a CFA ascertainable loss, they constitute "damages sustained" for remedy purposes under the CFA.

 Furthermore, neither *Gennari* nor *D'Agostino* firmly repudiates calculating treble damages using other factors in conjunction with ascertainable loss. "The treble damages remedy is mandatory under *N.J.S.A.* 56:8–19 if a consumer-fraud plaintiff proves both an unlawful practice under the Act and an ascertainable loss." *D'Agostino, supra,* 216 *N.J.* at 185, 78 *A.*3d 527 (citation and internal quotation marks omitted). *D'Agostino* held that the "CFA contemplates that courts will fashion individualized relief appropriate to the specific case, combining legal and equitable remedies in some settings." *Ibid.* As a result, in addition to damages sustained, there was no error by the trial court in incorporating other factors such as "the impact of the court's equitable remedy on the parties' positions" in calculating treble damages under the CFA. *Id.* at 198, 78 *A.*3d 527.

 Accordingly, even accepting as true that post-JONAH treatment costs are purely non-economic, ascertainable loss—although a condition precedent to a valid CFA claim—is not the exclusive measure for fashioning a proper remedy under the CFA. *D'Agostino* declined to adopt such "an inflexible rule," *id.* at 199, 78 *A.*3d 527, and this court must do likewise.

*Conclusion*

For the foregoing reasons, defendant JONAH's motion for partial summary judgment is denied. An appropriate order will follow.