**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0565-16T3

LEYKA ROSARIO and
CEZAR ROSARIO,

     Plaintiffs-Respondents,

v.

NJ AUTO GROUP, LLC and
MANUCHAR SURGULADZE,

     Defendants-Appellants.

_____

Argued September 13, 2018 – Decided January 24, 2019

Before Judges Fuentes and Accurso.

On appeal from Superior Court of New Jersey, Law Division, Union County, Docket No. DC-011718-15.

Joseph A. Bahgat (The Privacy Firm, PC) argued the cause for appellants.

David C. Ricci argued the cause for respondents.

PER CURIAM

Defendants NJ Auto Group, LLC and Manuchar Surguladze appeal from two orders, entered on reconsideration after trial, vacating a judgment for plaintiffs Leyka and Cezar Rosario for $4970 and entering a new trebled judgment of $14,910 and awarding $10,000 in attorney's fees under the Consumer Fraud Act, N.J.S.A. 56:8-1 to -195. Because plaintiffs failed to provide defendants with the materials supporting their motion for reconsideration, and the court's findings and conclusions on reconsideration are not supported by the evidence in the record, we reverse both orders and reinstate the judgment for $4970.

This dispute arose out of plaintiffs' purchase of a used car from defendants in September 2015. The case was tried over the course of one day in the Special Civil Part. Plaintiffs testified they went to defendants' used car dealership on September 2 to look at a 2006 Ford Escape advertised on Car Guru. Plaintiffs acknowledged Surguladze told them the "check engine" light flashed intermittently and that he thought the problem attributable to a loose hose that was leaking air. Based on its low mileage and Surguladze's representation it had a "clean title," plaintiffs purchased the car for $6180 plus tax of $432.60, for a total of $6612.60.

Plaintiffs paid half the purchase price by debit card and put the balance on a credit card. They also purchased a "6 months/7,500 miles" service contract because they "really wanted to get a warranty." Plaintiffs drove the car off the lot but did not sign documents transferring the title. They were to return for the title and tags after their funds were deposited into defendants' account.

Plaintiffs testified they immediately experienced problems with the car. Cezar Rosario claimed the car began to smoke on the drive home. He claimed he pulled over and called Surguladze, who told him the car had been sitting for some time and might be "that it's oil burning, or something of that nature." Rosario had the car looked over by a mechanic friend who "said pretty much the same thing." Plaintiffs took the car to STS for an oil change, and was told there was "a hole in the manifold . . . [o]r something of that nature."

Leyka Rosario claimed the car "shut down" while she was driving within a week of purchasing it. She called Surguladze on September 7, reporting the problem and demanding he take the car back. Surguladze told her the car was a hybrid vehicle designed to shut off when it came to a stop. As for taking the car back, she testified Surguladze told her "he had to think about it" but was not inclined to take it back. Following that conversation, she concluded Surguladze "was not willing to cooperate with us" and did not want the car back.

A-0565-16T3

Rosario also testified that once, after parking the car at her mother-in-law's, she "wasn't able to turn it on." Their mechanic friend recommended a locksmith, who came and unlocked the car, and told her "there was something going on with some fuse in the front." Plaintiffs took the car to a Ford dealership on September 11, which advised the car was subject to a recall for "some type of electrical problem that . . . makes the car have issues." Plaintiffs also asked the dealership to diagnose the manifold problem and were advised there was a problem with a leaking hose and "a bad PCV [(positive crankcase ventilation)] valve." The dealership replaced the car's coolant pump and repaired the water pump without charge as a result of the recall.

On or about September 12, plaintiffs received a letter from the entity issuing the service contract advising the warranty did not cover hybrid cars. On September 23, Cezar Rosario returned to the dealership to sign documents transferring the title, and defendants provided him a check for a full refund of the amount plaintiffs paid for the service contract. He testified he did not meet with Surguladze but with a "Spanish gentleman, the same guy who showed us the car."[1] He claimed the man did not mention anything about the title but

_____

[1] Surguladze testified he was the only person who dealt with plaintiffs as he was the sole employee of the dealership.

simply opened a folder with "the back of the title open for me, ready for me to sign." Rosario claimed he signed it, the man "handed me over the check and I walked out."

On September 28, Leyka Rosario, now suspicious about the condition of the car, obtained a Carfax report and learned, for the first time, the car had an accident history and its title was branded salvage. The report stated that six days before, on September 22, 2015, "[d]ealer took title of this vehicle while it was in inventory" and a "SALVAGE TITLE/CERTIFICATE ISSUED." Plaintiffs thereafter, unsuccessfully, disputed that part of the purchase price charged to their credit card. They claimed the car remained at their home in inoperable condition.

Surguladze testified he told plaintiffs the car's title was clean because it was both true and what he knew to be true when he sold them the car. He explained he bought the car from a dealer he dealt with regularly, who purchased the car at auction. When he took possession of the car, he was given the original, clean New York title, which he still possessed when he sold the car to plaintiffs on September 2, along with a reassignment to NJ Auto Group from the purchaser at auction. It was only when he applied to the New Jersey Division of Motor

5

Vehicles to "flip" the title to his company twenty days after the sale that he learned the New Jersey title would be issued as salvage.

Surguladze testified he called Cezar Rosario from the DMV office on September 22 when he learned the title was going to be issued as salvage and explained the problem to him. Surguladze claimed he offered to take the car back and issue plaintiffs a refund. Rosario, however, voiced no objection to the salvage title or to the warranty company's recent refusal to issue a service contract on a hybrid car.

Surguladze insisted he told plaintiffs the car had been in an accident but admitted the issue with the warranty was his mistake. He claimed he did not regularly sell hybrids and thought the "warranty would work for this car." When he learned it would not work, he refunded the purchase price of the warranty contract to plaintiffs. Surguladze testified he was the person Cezar Rosario met with when Rosario returned to the dealership to sign the title. According to Surguladze, Rosario made no complaint about the car when he came in to sign the salvage branded title: "Mr. Rosario came to my dealership and he [signed] the title, and I gave him the [warranty refund] check, and that was it."

According to Surguladze, the only complaint he got about the car from plaintiffs was a phone call from Leyka Rosario a few days after the purchase

6

complaining about the car shutting off. Surguladze testified he told her it was normal for a hybrid car to shut off, but that if she brought the car back he would look at it. He claimed Rosario told him she intended to take the car to a Ford dealer to ask if it was normal. He never heard anything further, and "figured that [Ford] explained what was happening, and she thought that it was a normal thing, and they were enjoying the car."

Surguladze claimed it was not until after Rosario signed the title and Surguladze sent plaintiffs the registration and tags that they tried to reverse the credit card transaction without communicating with him. He testified when he learned of the salvage history he offered to refund plaintiffs their money, claiming they had the "right to return the car" for a refund. Instead, he claimed plaintiffs returned to sign the salvage branded title, accepted the refund for the warranty and kept the car. When they later tried to reverse the credit card transaction without complaining to him or returning the car, Surguladze "thought they were trying to make money on this thing or something."

Plaintiffs offered an expert at trial. The expert, the owner of a car dealership and repair shop who had worked in the automotive field for almost twenty years, offered no opinion about the mechanical problems plaintiffs alleged they had with the car, limiting his testimony to the effect of a salvage

 A-0565-16T3

title on the car's value.  He testified a 2006 Ford Escape in good condition would have a retail market value of $7579.  The expert claimed the price plaintiffs paid for the car, $6180, was "just above" the $6000 a car with the mechanical problems, accident history and commercial usage[2] described to him should fetch at retail.  Although acknowledging the salvage branding had no effect on the car's functionality, he testified it had a huge effect on value, reducing the retail value of the car to $3009.

The expert admitted on cross-examination that selling a car without having "the title in hand," a practice "most of the bigger dealers" avoid, means "you don't technically own it, and then you don't know if it's salvage."  In response to the court's question of whether it was customary in the industry "to sell a vehicle without first having a title to the vehicle," the expert testified:

> Most places won't —  most — it depends on what — I can't —  it's hard to decide what — we — our policy is we do not sell cars unless we have the title.  If you — sometimes you can't get the title, something goes wrong with the title, then, you know, you have a sale that you sold a car you didn't have ownership to it. But also a case like this, there's no way —  if you don't have the title in hand, you really don't — I mean, you're selling a car blindly because you don't even know what it says on the title, whether the mile[age] is correct. And especially something like salvage or floods, you leave yourself open.

---

[2]  The car was purchased new by the New York City Department of Sanitation.

After hearing the testimony, the court entered judgment for plaintiffs for $4970, the difference between the purchase price, including sales tax, and the court's calculation of its retail value based on the testimony of plaintiffs' expert in light of its salvage title.[3] The court resolved the credibility disputes between the parties in defendants' favor. Specifically, the court found

> defendant credible because the court finds the fact that why would he disclose that the check engine light was on, that there was a hole in one of the hose for the manifold and then lie about telling them that it was an accident? The court does not believe that the defendant did not tell the plaintiffs that there was an accident on the vehicle, but he did not know the extent of the accident, and he did not inquire as to what the damage was from the person he purchased the vehicle from.
>
> The court also finds credible that he did not know until he received the title that the car was deemed salvageable in that regards. The court finds the defendant testimony to be credible in that regard. Whether he should have known is a different question. But the court finds that he did not know that the vehicle was status as salvage.

---

[3] The court based its award on the expert's testimony of the retail value of the car with a salvage title, $3009, and $1200, the sum the expert estimated a dealer would pay for the same car, "and determined that the vehicle, given the mechanical issues and the salvage value, should only been sold for $1809." As noted above, the expert actually testified that the pre-tax sales price was $180 over the value of the car without a salvage title but with its mechanical defects, accident history and prior commercial ownership. The expert claimed the car's actual retail value with that history was $3009. As defendants have not appealed from the original judgment, we do not address the issue further.

But the court does find the defendant to be credible that, one, he informed the plaintiffs about the condition of the vehicle because they both testified that he did. Two, that he told them that the vehicle had been in an accident, but he did not disclose to the extent. Nor does the court find that they inquired about it.

And the court finds, certainly, after knowing that the vehicle had mechanical issues that the vehicle was in an accident, the plaintiffs had the ability, at that time, to walk away from the deal before they purchased it, but they did not, understanding that the check engine light would come on, and that there may have been some mechanical issues with the vehicle.

The court also finds that once the defendant found out that the vehicle was titled salvage, that he tried to remedy the situation by either repairing it or offering to give the plaintiffs their money back. The court finds the defendant to be credible that the plaintiffs never attempted to bring the vehicle back to him. Neither plaintiff testified that they took the vehicle back to him.

The court rejected plaintiffs' claim related to the warranty because although it found Surguladze erred about the availability of an extended warranty, he cured that by refunding its purchase price. The court further found

more credible, that when — that the plaintiff/husband had knowledge, prior to signing over the title, that the title was now a title of salvage and that he still signed it and kept the vehicle.

As a result, the court finds that the defendant in this matter did not violate the Consumer Fraud Act for the reasons stated on the record. However, the court

10

does find that once the defendant found that the vehicle was — status was salvage, he had an obligation to only sell the vehicle for the value of what it would be as a salvage value vehicle.

The court accordingly concluded "defendant oversold the vehicle" and that once Surguladze learned the car would be issued a salvage title "should have, on his own, even if the plaintiffs did not ask for it," reduced the price, "knowing in his business that the price would have been substantially reduced from the sales price that he actually sold to the plaintiffs in this matter."

Plaintiffs moved for reconsideration, arguing, among other things, that the court "failed to appreciate, based on the evidence and the testimony" that Surguladze's statements at the time of sale regarding the state of the title and the availability of the service contract were affirmative misrepresentations, which resulted in ascertainable losses to them. In support of the motion, plaintiffs' counsel provided the court with a CD of the trial testimony and handwritten notes "pinpoint[ing] the spots in the recordings that were provided" without providing them to his adversary. After hearing counsel's arguments on reconsideration, the court replayed certain parts of the record of Surguladze's testimony and put its decision on the record.

The court concluded that

11

[a]s to the first element of the CFA, unlawful conduct, defendants engaged in affirmative misrepresentation to induce the plaintiffs to purchase the vehicle. The court finds that that misrepresentation, to the [plaintiffs], was that the vehicle had a clean title.

The plaintiffs testified that they were seeking a vehicle with a clean title and warranty. As to the title, it is undisputed that the defendants — the defendant in this matter represented to the plaintiff that the vehicle had a clean title when, in fact, it did not. The court played the CD for both parties in this matter and it was clear to this court that the defendant indicated that he believed that the car had a clean title. And, in fact, he disclosed the same to the plaintiffs in this matter, and they were under the impression that the car had a clean title and, therefore, that was material to them. And they subsequently purchased the car.

However, three weeks following the purchase, the defendants became aware of the salvage value of the vehicle. However, the knowledge of the falsity is not dispositive, as stated in Ji v. [Palmer, 333 N.J. Super. 451, 461 (App. Div. 2000)]. So because the defendant did not know that the car had been salvageable, that is not required that he know, or have the intent. The fact of the matter he's misrepresented to [plaintiffs] that the vehicle had a clean title. Status of the title was clearly material to the subject transaction.

With respect to the written warranty, the plaintiffs testified that they expressed to the defendants that they wanted a vehicle with a written warranty and, thereafter, the defendants represented to the plaintiffs that they were purchasing a service contract, which was false due to the fact that the hybrid vehicles are not eligible for cover. Essentially, defendants misrepresented the existence and the terms of the

12

service contract, constituting unlawful conduct in violation of the [N.J.S.A.] 56:8-68(g) and (h). The Court read what that meant. In that particular section, (g) and (h), (g) says to represent the terms of any warranty, service contract, or repair insurance offered by the dealer in connection with the sale of a used vehicle.

So the Court finds that when the defendant in this matter gave the plaintiffs the warranty, that he misrepresented that the warranty covered everything on the car. (h) of that statute says to represent prior to sale that a used vehicle is sold with a warranty, service contract, or repair insurance when the vehicle is sold without any warranty, service contract, or repair insurance.

While although it was sold with a repair service contract, the contract did not cover the entire vehicle. In fact, it didn't cover the vehicle because it was a hybrid vehicle, which the defendant had a responsibility to disclose, in this court's opinion, to the plaintiffs.

The court, therefore, finds that the — after taking another look at this matter that the defendant violated the Consumer Fraud Act by misrepresenting, one, that the car had a clean title, and, two, there was a warranty that existed on the car. But the warranty was not actually covering the vehicle because it was a hybrid.

As to ascertainable loss, which is the second factor that the court has to consider — as to the second element of the Consumer Fraud Act, ascertainable loss, the plaintiff suffered an ascertainable loss, evidenced by the — this court's determination on June 17th, 2016, at the trial court — during the trial, this court determined that the vehicle had a diminished value

13

because of its salvage status, and the plaintiff suffered damage in the amount of $4,970. So as stated in <u>Thiedemann [v. Mercedes-Benz USA, LLC</u>, 183 N.J. 234, 248 (2005)], a loss in value is sufficient to meet the ascertainable loss element.

As to the final element of the CFA, a casual relationship between the defendant's unlawful conduct and the plaintiff's ascertainable loss, there is no doubt that the defendant's affirmative misrepresentation caused the plaintiffs to suffer damages.

In conclusion, the defendant's conduct clearly, in this court's opinion, violated the Consumer Fraud Protection Act, and as such, this court finds that the motion for [re]consideration is granted. And, therefore, as a result of violating the Consumer Fraud Act, the court finds that the plaintiff in this matter is entitled to treble damages, which is three times the amount of the ascertainable loss, plus reasonable attorney's fees in this matter.

The court subsequently entered an order awarding plaintiffs $10,000 in attorney's fees as permitted by the Consumer Fraud Act.

Defendants appeal, arguing, among other things, that the proceedings on the motion for reconsideration were fundamentally unfair, denying them due process, and the decision should be reversed because the record does not support a finding that defendants violated the Consumer Fraud Act. We agree.

The record is clear that plaintiffs' counsel on reconsideration submitted a CD of the trial testimony to the court along with counsel's "handwritten

14

annotations as to when the relevant testimony occurred," which he did not provide to his adversary. It is equally clear that the court relied on those notes in listening to the recording of the trial testimony.[4] Plaintiffs excuse their counsel's failure to follow the rules against ex parte communications with the court on the basis that the court played those portions "pertinent, in [the] court's mind, to its decision in this particular matter" at argument on the motion.

As our Supreme Court has observed, "[f]undamentally, due process requires an opportunity to be heard at a meaningful time and in a meaningful manner." Doe v. Poritz, 142 N.J. 1, 106 (1995). It is beyond cavil that submitting documents in support of a motion to a court, not in camera, not provided to one's adversary deprives the adversary of any meaningful opportunity to mount a defense to the motion. See Klier v. Sordoni Skanska Constr. Co., 337 N.J. Super. 76, 83-85 (App. Div. 2001) (holding two days was insufficient for the plaintiffs to produce an expert's report and respond to a motion for dismissal because it did not afford them with "a meaningful opportunity to respond") (adding the "ultimate goal is not, and should not be,

---

[4] Plaintiffs' counsel stated on the record in open court that he "hope[d] [the court] was able to read my handwriting and pinpoint the spots in the recordings that were provided." The court responded that it had "listened to the part that you requested."

swift disposition of cases at the expense of fairness and justice," but rather "the fair resolution of controversies and disputes"). Our Rules are designed to prevent such "trial by ambush" tactics. See McKenney v. Jersey City Med. Ctr., 167 N.J. 359, 370 (2001) (explaining the search for truth in furtherance of justice is "designed to ensure that the outcome of litigation shall depend on its merits in the light of all of the available facts, rather than on the craftiness of the parties or the guile of their counsel").

Further, plaintiffs' counsel's failure to properly serve his adversary with all the documents he submitted to the court on reconsideration was not cured by the court playing what it perceived to be the relevant portions in open court. First, defendants were deprived of the opportunity to make an effective response to the motion in writing in advance as contemplated by our Rules. Second, the court only played those sections it deemed relevant after hearing argument, immediately before putting its decision on the record. In so doing, the court effectively deprived defendants' counsel of any opportunity to respond to plaintiffs' counsel selective review of the evidence presented at trial.

Upon learning defendants had not been served with documents the court had already reviewed, the court should have adjourned the motion and permitted defendants an opportunity to re-brief their opposition. Proceeding to hear and

16

decide the motion for reconsideration under those circumstances was an abuse of the court's discretion.

Turning to the merits, we find reversible error as well. After hearing the trial testimony, the court concluded Surguladze had not violated the Consumer Fraud Act when he represented the car had a clean title at the time of sale because it believed Surguladze's testimony that he only learned the title would be branded salvage twenty days after the sale when he went to "flip" the title to his company, and upon learning that offered to give plaintiffs their money back. On reconsideration, the court accepted plaintiffs' argument that Surguladze's knowledge of condition of the title was immaterial because "[o]ne who makes an affirmative misrepresentation is liable even in the absence of knowledge of the falsity of the misrepresentation, negligence, or the intent to deceive." Gennari v. Weichert Co. Realtors, 148 N.J. 582, 605 (1997).

The court failed to address, however, whether Surguladze's representation that the car had a "clean" title was actually false when he made it. Defendants' argument at trial was not only that Surguladze believed the car had a "clean" title when he sold it to plaintiffs on September 2, but that the representation was true when he made it because the salvage designation was only appended to the title twenty days later.

Plaintiffs asserted in the trial court, as they do on appeal, that defendants' argument rests on "the assumption that the New York Title issued in 2006 . . . was the effective 'title' on the September 2, 2015 transaction date and that therefore the 'title' was, in fact, 'clean.'" They argue that under New York law, that original title "was to be turned in to the New York Department of Motor Vehicles" after an alleged February 25, 2014 accident in New York and a "statement of acquisition" submitted, which "statement of acquisition" would then become "the proof of ownership, or 'title,' until September 22, 2015 when the New Jersey [Motor Vehicle Commission] issued a Certificate of Title to NJ Auto with the salvage brand."

In our view, however, it is plaintiffs' argument that rests on assumptions. Plaintiffs offered no evidence to the trial court as to the reasons New Jersey branded the title salvage or when the events giving rise to the designation occurred. Although plaintiffs assert the designation resulted from a 2014 accident noted on the Carfax report, there is no competent evidence in the trial record to support their supposition. No "statement of acquisition" was produced at trial and the testimony of plaintiffs' expert surely did not establish that defendants' sale of the car without having title in hand was contrary to an industry standard or violated any consumer protection regulation. Plaintiffs

A-0565-16T3

bore the burden of proving that Surguladze's representation as to the car's "clean" title was false when made. The court found defendant believed the statement was true and, as far as we can tell, there was no competent evidence admitted demonstrating it was false when made.

Further, we question whether plaintiffs could prove an ascertainable loss on this record, even if they could prove an affirmative misrepresentation as to the state of the title at the time of the sale. In that regard, we note the court's failure to address or disturb on reconsideration its finding that upon discovering the title would be branded salvage, Surguladze immediately disclosed it to Cezar Rosario and offered to take back the car, an offer plaintiffs declined.

Surguladze's good faith offer to rescind the transaction upon discovering the title would be branded salvage, seems to us to be the sort of "salutary efforts exerted by automobile merchants to address voluntarily and responsibly defects that may arise post-sale," the Court stated it did not wish to discourage in Thiedemann, 183 N.J. at 251. See also D'Agostino v. Maldonado, 216 N.J. 168, 194-95 (2013) (noting "[i]n some circumstances, if the defendant or a non-party takes action to ensure that the plaintiff sustains no out-of-pocket loss or loss of value prior to litigation, then plaintiff's CFA claim may fail"). We need not resolve whether Surguladze's offer to unwind the transaction precluded a finding

of ascertainable loss in light of our conclusion that plaintiffs failed to prove Surguladze affirmatively misrepresented the state of the title at the time of sale. It highlights, however, the court's failure to note the discrepancies between its factual findings after trial and its legal conclusions on reconsideration, or to make any effort to reconcile the two.

That brings us to our final point. In its findings after trial, the court accepted plaintiffs' testimony that defendants had misadvised them about the availability of a warranty, which Surguladze admitted. It denied liability on that claim, however, because defendants cured the mistake by refunding plaintiffs the full amount they paid for the policy. On reconsideration, the court found Surguladze misrepresented the availability of a warranty, but also found an ascertainable loss, namely the diminished value of the car because of its salvage status. The court did not address its earlier finding that defendants "cured" the misrepresentation by refunding the amount paid for the warranty or explain the relation between the absence of an extended warranty and the salvage title.

On appeal, plaintiffs try to bridge that gap by arguing that "the court found that the warranty was cancelled when plaintiffs sought to use it to repair the vehicle" and that plaintiffs "would not have purchased the vehicle" without the warranty. There is, however, no testimony supporting either assertion in the

A-0565-16T3

record.  Neither plaintiff testified they "sought to use" the warranty.  Instead, they testified they got a letter nearly a month after they bought the car advising their application was denied because the policy did not cover hybrid cars. Although Leyka Rosario testified they "really wanted to get a warranty," she nowhere suggested they would not have purchased the car without it.  Indeed, Cezar Rosario signed the title after plaintiffs were advised there was no warranty available and defendants provided them with a check that refunded what they had paid for it.

Further, plaintiffs' expert testified, and the court found, the salvage title had no effect on the car's functionality.  Accordingly, there is no link on this record between the failure to provide a warranty and the diminution in value resulting from the salvage branded title.  There is thus no evidential basis for the court's finding on reconsideration that the absence of the warranty resulted in an ascertainable loss.  As plaintiffs failed to prove a consumer fraud claim, they had no entitlement to treble damages or an attorney's fee award.

In sum, because the court abused its discretion in entertaining the motion for reconsideration after learning plaintiffs' counsel had failed to provide his adversary with documents provided to the court, and its findings and conclusions on reconsideration are not supported by the evidence in the record, we reverse

21

both orders and reinstate the judgment for $4970. We also remand to permit the court to address the return to defendants any funds collected by plaintiffs in excess of the amount of the original judgment. We do not retain jurisdiction.

Reversed and remanded.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0565-16T3