NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0379-20

YOEL ROMERO,

      Plaintiff-Respondent,

v.

GOLD STAR
DISTRIBUTION, LLC,
d/b/a GOLDSTAR
PERFORMANCE PRODUCTS,
a business entity,

      Defendant-Appellant.

_____

> **APPROVED FOR PUBLICATION**
>
> **June 24, 2021**
>
> **APPELLATE DIVISION**

Argued April 28, 2021 – Decided June 24, 2021

Before Judges Whipple, Rose and Firko.

On appeal from the Superior Court of New Jersey,
Law Division, Middlesex County, Docket No. L-7287-
17.

Desiree L. Wilfong argued the cause for appellant
(Lucas & Cavalier, LLC, attorneys; Desiree L.
Wilfong and Robert M. Cavalier, of counsel and on
the briefs).

Jeffrey S. Craig and Howard Jacobs (Law Offices of
Howard Jacobs) of the California bar, admitted pro
hac vice, argued the cause for respondent (Craig,
Annin & Baxter, LLP, attorneys; Jeffrey S. Craig and
Howard Jacobs on the briefs).

The opinion of the court was delivered by

FIRKO, J.A.D.

Defendant Gold Star Distribution, LLC, d/b/a Goldstar Performance Products, appeals from an August 25, 2020 Law Division order denying its motion to vacate final judgment by default. In this opinion, we reiterate well-settled principles set forth in Rule 4:50-1 and the standard for calculating damages under the New Jersey Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -226. We affirm in part, and reverse and remand in part, on the issue of damages.

I.

The following facts are derived from the record on appeal. Plaintiff, a resident of Miami, Florida, is a professional mixed martial arts (MMA) athlete who competed in the Ultimate Fighting Championship (UFC), the highest level of competition in MMA. He is also a former world champion freestyle wrestler who earned a silver medal at the 2000 Olympic Games.

Defendant is a dietary supplement company, doing business as Goldstar Performance Products, having a principal place of business in New Jersey. The president of Gold Star Distribution, LLC is Steven Hankin. According to plaintiff, he consumed one of defendant's products called "SHED RX," relying upon defendant's representation that the product it manufactured, marketed,

and sold, was free of any substances banned by the World Anti-Doping Agency (WADA). SHED RX is marketed as a fast-acting, maximum strength diuretic water weight loss muscle definition formula and is sold in capsule form. The SHED RX label states it "uses natural ingredients" and that defendant adheres to "strict GC/MS and HPLC testing procedures."[1]

In order to ensure compliance with WADA regulations, plaintiff conducted his own research to confirm SHED RX did not contain any banned substances, including ibutamoren,[2] in order to avoid being disqualified from competitions. Plaintiff also read the SHED RX label and discussed ingesting the product with his colleagues to ensure its compliance with WADA's

---

[1] GC/MS stands for gas chromatography coupled with mass spectrometry. "The most sophisticated drug-testing approach is gas chromatography coupled with mass spectrometry (GC/MS), which is regarded as a 'gold standard'; it is used in confirmatory testing." B.M. Kapur, Drug Testing Methods and Clinical Interpretations of Test Results, 45 Bull. Narcotics 115 (1993).

HPLC stands for high performance liquid chromatography. "[HPLC] is now one of the most powerful tools in analytical chemistry as it has the ability to identify, separate and quantitate the compounds that are present in any sample that can be dissolved in any liquid." Vikram Kamar et al., An Overview on HPLC Method Development, Optimization and Validation Process for Drug Analysis, 2 Pharm. & Chem. J. 30, 31 (2015).

[2] Ibutamoren, also known as ibutamoren mesylate and MK-0677, is a growth hormone supplement that is consumed orally and is not currently approved by the Food and Drug Administration. Ibutamoren is available by prescription through compounding pharmacies in the United States and abroad. John T. Sigalos & Alexander W. Pastuszak, The Safety and Efficacy of Growth Hormone Secretagogues, 6(1) Sexual Med. Rev. 45 (2018).

3

regulations. Being satisfied SHED RX was safe and not contraindicated by WADA, plaintiff started taking the product. To his surprise, when a random urine sample required by the United States Anti-Doping Agency (USADA) was collected on December 16, 2015, plaintiff tested positive for ibutamoren. The urine sample was tested by the Sports Medicine Research and Testing Laboratory (SMRTL) in Salt Lake City, Utah, which is accredited by WADA.

This was the first time plaintiff ever tested positive for a banned substance in his athletic career. Because of his positive test result, plaintiff was suspended by the UFC for a period of six months, commencing on January 12, 2016. According to plaintiff, he was a "lead contender" for the UFC middleweight title at the time and was denied the opportunity to fight. Plaintiff also claims he was denied other promising career opportunities and was characterized as a "doper" by the press and the public.

The USADA was provided with a capsule from the bottle of SHED RX used by plaintiff and sent it to SMRTL for testing. Several capsules from an independently purchased SHED RX bottle were also tested by SMRTL and contained ibutamoren—twelve micrograms per capsule. Ibutamoren was not listed as an ingredient on the SHED RX label for the bottles examined, which were sold throughout stores in the United States and online.

A-0379-20

On December 11, 2017, plaintiff filed a complaint in the Law Division against defendant alleging negligence (count one), products liability (count two), breach of implied warranties (count three), intentional misrepresentation (count four), negligent misrepresentation (count five), violations of the CFA (count six), and punitive damages (count seven). Specifically, plaintiff alleged defendant failed to exercise ordinary care by carelessly and negligently maintaining the production facility where SHED RX was contaminated with ibutamoren; negligently sold SHED RX to competitive athletes and the general public; failed to design a safe manufacturing process to eliminate cross-contamination with other products; failed to adhere to government regulations; and failed to disclose known dangers inherent in the consumption of SHED RX.

Goldstar Performance Products was named as defendant in the caption based on the packaging and advertising materials of the SHED RX product, as well as the LinkedIn profile of Hankin and the email address he actively used, shankin@goldstarperformanceproducts.com. Goldstar Performance Products is the trade name for Gold Star Distribution, LLC and the entity that SHED RX was marketed under.

On December 12, 2017, a summons was issued to defendant, and plaintiff's counsel enlisted a private process server to serve the summons and

5

complaint on defendant. Because defendant and its president, Hankin, evaded service of process, service was not achieved, and the matter was scheduled on the court's administrative dismissal list. On June 6, 2018, plaintiff filed a motion to remove the complaint from the administrative dismissal list and to allow substituted service of the summons and complaint upon defendant by mail pursuant to Rule 4:4-5(a)(2) or by publication pursuant to Rule 4:4-5(a)(3).

Three affidavits prepared by the process server were submitted in support of plaintiff's motion attesting to attempts to serve defendant and Hankin at two different addresses in East Hanover and one address in Randolph Township. The addresses in East Hanover were defunct; the address in Randolph Township was Hankin's home. Five unsuccessful attempts were made by the process server to effectuate process on Hankin at his home. On one occasion, the process server attested in an affidavit that Hankin's wife was "pulling out of the driveway and she told me her husband was away and will be expected back tomorrow." The process server made four more attempts to serve Hankin without success, noting "there is a[n] SUV visible in the garage and no one will answer the door."

On June 22, 2018, the court granted plaintiff's motion for substituted service pursuant to Rule 1:13-7(c)(4) and removed the case from the dismissal

list. In his affidavit of service dated June 20, 2018, counsel for plaintiff confirmed the summons and complaint were served on June 5, 2018, by way of certified mail, return receipt requested (RRR), and regular mail at the Randolph Township address. Attached to counsel's affidavit of service was a certified mail green card with Hankin's signature dated June 7, 2018. Defendant has not contested the genuineness of Hankin's signature.

Defendant did not answer or otherwise move with respect to the summons and complaint served upon Hankin. Defendant claims that since Gold Star Distribution, LLC was not named as a defendant and was not served with process, Hankin was not obligated to answer or otherwise move with respect to the complaint. Pursuant to Rule 4:43-1, plaintiff requested the clerk enter default against defendant on August 23, 2018, which was granted.

On September 5, 2018, Hankin sent an email to his insurance agent, Erik Bloom, of The Mallory Agency, entitled "lawsuit" regarding potential exposure and coverage for a possible claim. The email address used by Hankin was shankin@goldstarperformanceproducts.com. Hankin did not retain counsel or follow up with defendant's insurance company relative to defending the allegations set forth in the complaint. Consequently, on November 14, 2018, plaintiff moved for entry of default judgment under Rule 4:43-2(b) on the issue of liability and requested that a proof hearing be

scheduled by the court on the issue of damages. The notice of motion was sent to Hankin, on behalf of defendant, at his Randolph home address via certified mail RRR. The motion was unopposed.

On December 7, 2018, the motion court granted plaintiff's motion for final judgment by default as to liability against defendant and directed the civil assignment office to schedule the matter for a proof hearing pursuant to Rule 4:43-2(b). The memorializing order also provided that counsel for plaintiff was directed to serve a copy of the order "notifying [d]efendant Goldstar of the proof hearing date by [c]ertified RRR and [r]egular [m]ail at least [twenty] days prior to the proof hearing."

On March 22, 2019, counsel for plaintiff sent Hankin, on behalf of defendant, a letter certified mail RRR and regular mail, enclosing a copy of the order granting default judgment and advising him of the proof hearing scheduled for April 30, 2019. Neither Hankin nor anyone on behalf of defendant responded. Because of a scheduling conflict and the need for a Spanish interpreter, the proof hearing was adjourned to May 28, 2019. Plaintiff sent a confirming letter to the court and copied Hankin on the letter, which was sent certified mail RRR and regular mail, advising of the new date. No response was made by Hankin or anyone on behalf of defendant.

A-0379-20

The proof hearing proceeded on May 28, 2019 before a different trial court.[3] No one appeared on behalf of defendant. After hearing unrefuted testimony from plaintiff, and his manager, Abraham Kawa, and considering evidence as to economic and other damages, the trial court awarded the following amounts to plaintiff: $3,150,000 for lost wages and income; $3,000,000 for reputational damages; and $3,000,000 for infliction of emotional distress. In addition, the trial court trebled all three categories of damages under the CFA, culminating in an award of $27,450,000, plus prejudgment interest and costs, totaling $27,653,147.80.[4] A memorializing order was entered on June 3, 2019.[5]

Following the proof hearing, counsel for plaintiff sent a copy of the final judgment order and an information subpoena to defendant pursuant to Rule 6:7-2(b), in care of Hankin, to his Randolph address by regular and certified mail RRR on June 28, 2019. Defendant was obligated to answer the

---

[3] We requested that counsel provide a copy of the May 28, 2019 proof hearing transcript, which was not included in the appendices.

[4] At oral argument, we requested that counsel submit supplemental briefs addressing the following question: does trebling of all three categories of damages, i.e., $3,150,000 in lost wages and income, $3,000,000 for reputational damages, and $3,000,000 for infliction of emotional distress, constitute reversible error under the CFA?

[5] The order also awarded attorney's fees to plaintiff's counsel in accordance with Rule 1:21-7(f). The issue of counsel fees is not before us.

information subpoena within fourteen days. As plaintiff embarked on collection efforts, counsel discovered that defendant's correct legal name is Gold Star Distribution, LLC d/b/a Goldstar Performance Products. Plaintiff promptly filed a motion on September 20, 2019, to amend the final judgment to correct defendant's name pursuant to Rule 4:9-1, and in aid of litigant's rights, based on defendant's failure to respond to the information subpoena.

On October 11, 2019, the motion court granted plaintiff's motion to amend the judgment and in aid of litigant's rights. Gold Star Distribution, LLC was added as a judgment debtor and was ordered to answer the information subpoena within fourteen days. On October 16, 2019, plaintiff served defendant with the order amending final judgment and the information subpoena by certified mail RRR and regular mail. No action was taken by defendant.

On December 4, 2019, plaintiff moved to compel Hankin, as defendant's representative, to appear for a deposition in aid of enforcement of the judgment pursuant to Rule 6:7-2(a) and answer the outstanding information subpoena. On January 10, 2020, the court granted plaintiff's motion and: (1) ordered that Hankin, or another representative of defendant with knowledge of its finances, appear on January 22, 2020, under oath to answer the outstanding information subpoena and provide relevant financial documentation; (2) held

defendant in contempt for failing to abide by the court's October 11, 2019 order requiring answers to the information subpoena; and (3) awarded plaintiff $1235 in counsel fees. In addition, the order provided that a bench warrant would issue for Hankin's arrest if he or another representative of defendant failed to appear for the deposition on January 22, 2020.

Before plaintiff filed a motion for Hankin's arrest in accordance with the January 10, 2020 order, Hankin personally emailed plaintiff's counsel on February 3, 2020, advising:

> I just wanted to let you know that I thought this whole suit was submitted to the insurance company previously through the insurance broker, but apparently it wasn't. I contacted the broker and they submitted the claim as of last week. It's the insurance company who needs to deal with this because I don't have any money whatsoever as you probably know. If you want to talk I can call you.
>
> Markel Insurance
> Evanston Insurance Company
> 4521 Highwoods Parkway
> Glen Allen, VA 23060
> PH 804-273-1486
> Fax 804-217-8777

In response, plaintiff agreed to temporarily suspend collection efforts in exchange for information from Hankin regarding his company and his alleged communications with his insurance broker and insurer. Thereafter, Hankin initiated a number of unprofessional email communications with plaintiff's

counsel and in a February 19, 2020 email insinuated that a female associate employed at the firm, who was not working on the matter, fly across the country, meet him for dinner, and discuss a potential settlement of the matter.

Thereafter, plaintiff's counsel declined to engage in any further communication with Hankin following his February 19, 2020 email. Indeed, no further communication ensued until March 16, 2020, when plaintiff's counsel received a telephone call from an attorney identifying herself as defendant's counsel and explaining she was retained by defendant's insurance carrier, Grange Insurance Company.

On May 28, 2020, defendant filed a motion to vacate the default judgment as to liability entered on December 7, 2018, and damages entered on June 3, 2019, pursuant to Rule 4:50-1(a), (d), and (f), approximately ten weeks after defendant's counsel entered an appearance on March 11, 2020, and after plaintiff's counsel filed a writ of execution relative to one of defendant's bank accounts. On June 11, 2020, plaintiff filed opposition and a cross-motion to enforce litigant's rights. The motion court conducted oral argument via Zoom on July 10, 2020. On August 25, 2020, the court denied defendant's motion to vacate default judgment and granted plaintiff's motion to enforce litigant's rights, holding defendant and Hankin in contempt of court under Rule 1:10-3 for violating the October 11, 2019 and January 10, 2020 orders.

In a comprehensive written decision, the motion court found:

> Defendant's instant [m]otion seeks to vacate both the [d]efault [j]udgment as to liability entered on December 7, 2018 and the [f]inal [j]udgment as to damages entered after the proof hearing conducted on June 3, 2019, based on [Rule 4]:50-1(a), (d) and (f). [Rule] 4:50-2 expressly provides that a motion to vacate a judgment must be made "within a reasonable time" and for motions relying on sub-section (a) for "mistake, inadvertence, surprise, or excusable neglect" not more than one (1) year after the entry of judgment. Defendant's [m]otion to vacate the [j]udgment as to liability entered on December 7, 2018 under [Rule] 4:50-1(a) is time[-]barred under [Rule] 4:50-2 as it has been over seventeen . . . months since the entry of judgment as to liability when the present motion to vacate was filed on May 28, 2020. The [c]ourt now considers the [m]otion to [v]acate the [f]inal [j]udgment as to damages only.
>
> . . . .
>
> The type of mistake contemplated under [Rule] 4:50-1(a) has been described as one "which the parties could not have protected themselves from during the litigation." DEG, LLC v. Twp. of Fairfield, 198 N.J. 242, 261 (2009). In the present matter, [d]efendant had ample and multiple opportunities to participate in this litigation prior to the entry of final judgment. In June 2018, [d]efendant, via Mr. Hankin, received the [s]ummons and [c]omplaint after a [m]otion for [s]ubstituted [s]ervice was granted. In November 2018, [d]efendant, via Mr. Hankin, was served by regular and certified RRR mail the [n]otice of [m]otion for [e]ntry of [d]efault [j]udgment as to [l]iability pursuant to [Rule] 4:43-2(b) wherein a [p]roof [h]earing was requested as to damages. Mr. Hankin did not respond. Default judgment was granted in December 2018. Mr. Hankin was then

13

notified via certified RRR and regular mail, containing the [d]efault [j]udgment and advising of the proof hearing for damages scheduled for April 30, 2019. He was again notified via the same process of the adjournment of the proof hearing until May 28, 2019. Mr. Hankin failed to appear. Following the hearing, he was sent a copy of the [f]inal [j]udgment and [i]nformation [s]ubpoena via RRR and certified mail. Mr. Hankin ignored the [i]nformation [s]ubpoena that required his response within [fourteen] days.

On October 11, 2019, the [c]ourt granted [p]laintiff's unopposed motion to amend the [j]udgment (to correct Goldstar's name) and in aid of litigant's rights. On October 16, 2019, Mr. Hankin was served with a copy of the same and another [i]nformation [s]ubpoena. Again, [d]efendant did nothing. On December 4, 2019, [p]laintiff filed a [n]otice of [m]otion in [a]id of [l]itigant's [r]ights compelling [d]efendant/Mr. Hankin to appear at counsel's office to answer the [i]nformation [s]ubpoena. On January 10, 2020, the [c]ourt granted this motion, also unopposed. On January 22, 2020, Mr. Hankin failed to appear to [p]laintiff's counsel's office, as ordered.

Mr. Hankin emailed [p]laintiff's counsel on February 3, 2020, advising that he was aware of the lawsuit and that he thought that it was being handled by his insurance company, despite the fact that he had received no less than nine . . . letters and motions from [p]laintiff dated from September 6, 2018, the date when he first sent the [c]omplaint to his insurance agent. Further, [d]efendant's counsel entered a formal appearance on March 11, 2020 but waited [seventy-eight] days ([eleven] weeks) to file the instant [m]otion to [v]acate, only doing so after [p]laintiff had levied a [w]rit of [e]xecution on one of [d]efendant's bank accounts. On behalf of the [d]efendant, Mr. Hankin, its [p]resident, contends that service on

14

Goldstar Performance Products was a "sham" because the correct legal name was "Gold Star Distribution, LLC."

Now, and only now, well after acknowledged awareness of the lawsuit and multiple opportunities to retain counsel and/or otherwise enter an appearance and seek relief from each and every adverse proceeding that [ensued] of which he and the [d]efendant (through him) were on notice of, Mr. Hankin claims what, in this particular case, amounts to a distinction without a difference: one is the trade name and the other the legal entity that utilized that trade name. He does not dispute that Gold Star Distribution, LLC traded as Goldstar Performance Products. Nor does he dispute that Gold Star Distribution, LLC, t/a Goldstar Performance Products, is the entity that manufactured, sold and supplied the [p]laintiff with the SHED RX product at issue. At the very latest, the time to have registered that purported "sham" defense was when the [p]laintiff moved on September 20, 2019 to amend the [f]inal [j]udgment [o]rder for damages entered three . . . months earlier on June 3, 2019. Certainly, he should have moved on similar grounds to vacate the [f]inal [j]udgment by [d]efault entered by the [c]ourt back on December 7, 2018 on the issue of liability, or even earlier than that when he first acknowledged service of the [s]ummons and [c]omplaint in June of 2018. Instead, he did nothing.

Mr. Hankin had ample notice of the lawsuit and subsequent motion practice by the [p]laintiff and his argument for "excusable neglect" fails with even minimum scrutiny. When he received notice in November 2018 that a default judgment was being sought, he knew or should have known that his insurance company was not "handling it" as he now claims, yet he did not act. The fact that he needed to do something to protect the interests of his company

15

were repeatedly and emphatically demonstrated over the next [eighteen] months before he filed this [m]otion to [v]acate: when [d]efault was entered in December 2018; when the [d]amages [p]roof [h]earing was scheduled in April 2019; when the [d]amages [p]roof [h]earing was rescheduled to May 2019; when a [f]inal [j]udgment for more than [twenty-seven] million [dollars] was entered in June 2019; when the [m]otion to amend the [f]inal [j]udgment to correct the name of [d]efendant as Gold Star Distribution, LLC was filed in September 2019; when the [j]udgment was amended to correct the name of [d]efendant as Gold Star Distribution, LLC in October 2019; when he was ordered to appear for a debtor's examination in January 2020; and when he responded to opposing counsel via email with a grotesquely inappropriate invitation and overture to an associate in February 2020.

It cannot be said or plausibly maintained, as Goldstar urges, that the [f]inal [j]udgment of June 3, 2019 was void or voidable so as to warrant relief under sub-section (d) of [Rule] 4:50-1. Even if Goldstar Performance Products (the trade name) was not a legal entity against which judgment should or could lie—but rather, that Gold Star Distribution, LLC was—it is incontrovertible that Gold Star Distribution, LLC was involved in the manufacture, distribution and supply of Goldstar Performance Products and, specifically, the SHED RX product that disaffected the [p]laintiff and gave rise to this suit ab initio. While not formally joined until the post-judgment amendment made and permitted in October 2019 so as to allegedly render the judgment void or voidable, as defense counsel urges, Mr. Hankin, as its principal, well aware of whatever distinction there was between the two, was also well aware of the motion to amend and yet failed to oppose it. Applying the principles of equitable estoppel above-referenced, precisely because of the history of his conduct in "ducking" service from

16

> the outset yet acknowledging the fact of the suit against his company by referring the duly served [s]ummons and [c]omplaint to its insurance carrier, both he and Gold Star Distribution, LLC are estopped from disavowing that conduct and denying that Goldstar Performance Products and the formal corporate entity were and are one and the same thing here for judgment purposes.

In addition, the motion court found defendant waited almost one year to file its Rule 4:50-1 motion to vacate and seventy-eight days after its counsel entered an appearance after the proof hearing. Under Rule 4:50-2, the motion court noted the final judgment by default was entered on December 7, 2019, and defendant "failed to timely move" to vacate the underlying judgment.

Considering the timeline and history, the motion court also determined that defendant's failure to seek Rule 4:50-1 relief was not the result of mistake, inadvertence, surprise, or excusable neglect. Rather, Hankin's "neglect was deliberate and calculated." Defendant's motion to vacate was denied and an order to that effect was entered.

On September 8, 2020, Hankin appeared for his court-ordered deposition represented by counsel via Zoom. Because Hankin only produced a portion of court-ordered documents pertaining to defendant's financial status, the deposition was rescheduled to January 21, 2020. This appeal ensued.

On appeal, defendant argues that the motion court abused its discretion in denying its motion because (1) the standard for vacating the default

17                                                                    A-0379-20

judgment was improperly applied and unfair bias was shown to plaintiff; (2) the court failed to consider all of the reasons related to the timing of defendant's motion and in finding that Hankin purposely evaded service without evidential support; (3) excusable neglect has been shown under Rule 4:50-1(a); (4) defendant has a meritorious defense; and (5) the court did not consider relevant and authoritative case law on naming and serving the correct entity.

II.

A. <u>Standard for Vacating Default Judgment</u>

"Generally, a decision to vacate a default judgment lies within the sound discretion of the trial court, guided by principles of equity." <u>Coryell, L.L.C. v. Curry</u>, 391 N.J. Super. 72, 79 (App. Div. 2006) (citing <u>Hous. Auth. of Morristown v. Little</u>, 135 N.J. 274, 283 (1994)); <u>see also</u> <u>Del Vecchio v. Hemberger</u>, 388 N.J. Super. 179, 186-87 (App. Div. 2006). The trial court's judgment will be left undisturbed "unless it represents a clear abuse of discretion." <u>Hous. Auth. of Morristown</u>, 135 N.J. at 283.

In particular, a well-established two-pronged test applies. "In order to achieve relief pursuant to [Rule 4:50-1] subsection (a) . . . the defendant must be prepared to 'show that [1] [his or her] neglect to answer was excusable under the circumstances and [2] that [he or she] has a meritorious defense.'"

18

Dynasty Bldg. Corp. v. Ackerman, 376 N.J. Super. 280, 285 (App. Div. 2005) (quoting Marder v. Realty Constr. Co., 84 N.J. Super. 313, 318 (App. Div. 1964)).

In Mancini v. EDS, 132 N.J. 330 (1993), the Supreme Court recognized that "[a] defendant seeking to reopen a default judgment [because of excusable neglect] must show that the neglect to answer was excusable under the circumstances and that [he or she] has a meritorious defense." Id. at 335-36 (second alteration in original) (internal quotations and citations omitted). The Court further elaborated that "[c]arelessness may be excusable when attributable to an honest mistake that is compatible with due diligence or reasonable prudence." Id. at 335.

From our review of the record, we conclude that the motion court's discretion was properly exercised. Rule 4:50-1 governs relief from final judgment and orders:

> On motion, with briefs, and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment or order for the following reasons: (a) mistake, inadvertence, surprise, or excusable neglect; (b) newly discovered evidence which would probably alter the judgment or order and which by due diligence could not have been discovered in time to move for a new trial under [Rule] 4:49; (c) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (d) the judgment or order is void; (e) the judgment or order

19

has been satisfied, released or discharged, or a prior judgment or order upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment or order should have prospective application; or (f) any other reason justifying relief from the operation of the judgment or order.

Applications to vacate default judgments are liberally construed so that cases may be decided on the merits. Pressler & Verniero, Current N.J. Court Rules, cmt. 4.1 on R. 4:50-1 (2021); Pro. Stone, Stucco & Siding Applicators, Inc. v. Carter, 409 N.J. Super. 64, 68 (App. Div. 2009). A default judgment, however, will not be disturbed unless defendants can "establish that [their] failure to answer was due to excusable neglect and that [they have] a meritorious defense." Goldhaber v. Kohlenberg, 395 N.J. Super. 380, 391 (App. Div. 2007).

The party seeking to vacate a default judgment has the "overall burden of demonstrating that its failure to answer or otherwise appear and defend should be excused." Jameson v. Great Atl. and Pac. Tea Co., 363 N.J. Super. 419, 425-26 (App. Div. 2003). The meritorious defense requirement is only waived upon proof that the default was obtained through defective service of process. Rogan Equities, Inc. v. Santini, 289 N.J. Super. 95, 113-114 (App. Div. 1996).

A-0379-20

Because the motion court analyzed defendant's motion to vacate in depth and applied the great liberality standard under Rule 4:50-1 and Hous. Auth. of Morristown, we discern no abuse of discretion in the denial of defendant's motion. Moreover, we are satisfied from our review of the record that the motion judge did not show any prejudice against defendant by incorporating parts of plaintiff's submission into its opinion. The court's findings are supported by substantial credible evidence in the record.

A litigant has the burden of proving his or her allegations of judicial misconduct by clear and convincing evidence. In re Perskie, 207 N.J. 275, 289 (2011) (citing R. 2:15-15(a)); see also Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 169 (2006). Accordingly, defendant's generic and unsubstantiated allegation that the motion court held impermissible bias is clearly insufficient to meet the clear and convincing standard.

B. The Timing of Defendant's Motion and Hankin's Evasion of Service

We next address defendant's contention that the motion court improvidently considered the totality of the procedural history in determining the motion to vacate was untimely filed and defendant took an unreasonable time to file. Defendant contends October 11, 2019, when Gold Star Distribution, LLC was first named as a judgment debtor, should be deemed the operative date to invoke the one-year time limit prescribed by Rule 4:50-2, not

the June 3, 2019 date when judgment was initially entered. In defendant's view, the delay and filing of its motion to vacate was accomplished only seven months after Gold Star Distribution, LLC was added to the litigation, not the 359 days found by the motion court.

Rule 4:50-2 provides the time frame within which a motion seeking relief under Rule 4:50-1 must be filed. The rule states "[t]he motion shall be made within a reasonable time, and for reasons (a), (b) and (c) of R[ule] 4:50-1 not more than one year after the judgment, order or proceeding was entered or taken." R. 4:50-2 (emphasis added). We have explained that a reasonable time is determined based upon the totality of the circumstances, and in regard to motions brought under Rule 4:50-1 (a), (b) and (c) that one year "represents only the outermost time limit for the filing of a motion." Orner v. Liu, 419 N.J. Super. 431, 437 (App. Div. 2011).

This expressly means that motions under subsections (a), (b) and (c) must be filed within a "reasonable time" and "not more than one year after the judgment," ibid., while motions under subsections (d), (e) and (f) must be brought within a "reasonable time," which could be more or less than one year after the judgment, depending on the circumstances. See Garza v. Paone, 44 N.J. Super. 553, 557-58 (App. Div. 1957).

The trial court has the discretion to consider the circumstances of each case, and in some instances a reasonable time may be less than one year. Orner, 419 N.J. Super. at 437. Recently, we reiterated the application of the reasonable time analysis, stating, "motions governed by the outer limit of one year must still be filed within 'a reasonable time' which may be far shorter than one year." N.J. Div. of Child Prot. and Permanency v. A.L., 462 N.J. Super. 127, 136 n.5 (App. Div. 2020) (citing Orner, 419 N.J. Super. at 436-37).

This case does not involve a defendant who was unaware of the pending litigation, of a request to enter default, or of entry of a judgment and an amended judgment. It also does not involve a defendant who was deprived of an opportunity to defend. Rather, Hankin was served on June 7, 2018, and almost three months later, contacted his insurance agent on September 5, 2018. Defendant does not challenge the validity of the substituted service by mail. Moreover, Hankin was well aware of the claims against his company for almost a year when the final order for judgment was entered on June 3, 2019. He chose to ignore every notice properly served upon him until January 3, 2020, when he notified his insurance carrier of the lawsuit.

Even if the original judgment was defective because of an improper or partially named defendant, Hankin had to file a motion to vacate it within a reasonable time. We are satisfied that the lapse of 359 days after Hankin

23

learned of the matter was not reasonable under the totality of the circumstances in this case. See Jackson Constr. Co. v. Ocean Twp., 182 N.J. Super. 148, 152 (Tax Ct. 1981) (holding that a delay of nine months was unreasonable under the circumstances).

We also reject defendant's claim that Hankin believed the insurance company was handling the matter. The record clearly shows Hankin sent an email to his broker on September 5, 2018, about the lawsuit. Hankin's unspecified insurance coverage and representation claim lacks competent evidentiary support in the record on this appeal. Even if such evidence existed, after Hankin was served with approximately nine letters and notifications from plaintiff's counsel about the litigation between September 6, 2018, and February 3, 2020, he knew or should have known that the insurance company was not defending the claim. Hankin failed to exercise due diligence thereafter to determine why the insurance company was not protecting defendant's interests. Therefore, the motion court properly denied defendant's motion to vacate.

C. Excusable Neglect Under Rule 4:50-1(a)

Defendant also challenges the motion court's denial of its motion to vacate under Rule 4:50-1(a) and suggests that Hankin's failure to participate in the litigation constitutes excusable neglect. In support of this contention,

24

Hankin argues that by notifying defendant's insurance broker of the lawsuit, Hankin absolved himself of the obligation to act or participate in any further capacity.

Our Court has made clear that "a defendant seeking to reopen a default judgment because of excusable neglect must show that the failure to answer was excusable under the circumstances and that a meritorious defense is available." Hous. Auth. of Morristown, 135 N.J. at 284; see also Mancini, 132 N.J. at 334-35. Excusable neglect has been defined as a situation where the default was "attributable to an honest mistake that is compatible with due diligence or reasonable prudence." U.S. Bank Nat'l Ass'n v. Guillaume, 209 N.J. 449, 468 (2012) (quoting Mancini, 132 N.J. at 335). Most succinctly, our Court has described excusable neglect as something the parties could not have protected themselves from during the litigation. DEG, LLC v. Twp. of Fairfield, 198 N.J. 242, 261 (2009) (emphasis added).

Further, corporations are held to a higher standard because "being entities that should expect to be sued from time to time, [they] have an obligation to institute procedures within their organization for receiving and responding to law suits." Davis v. DND/Fidoreo, Inc., 317 N.J. Super. 92, 98 (App. Div. 1998). Finally, the party seeking to vacate the default has the

"overall burden of demonstrating that its failure to answer or otherwise appear and defend should be excused." Jameson, 363 N.J. Super. at 425-26.

Defendant alleges he notified his insurance broker, Erik Bloom of The Mallory Agency, of the lawsuit by email and phone on September 5, 2018. However, very little proof of such contact, or the extent of the information that was passed along to Bloom, exists in the record. There are two concise emails contained in defendant's appendix, and it is unclear from the record whether a copy of the complaint was ever forwarded to Bloom. Moreover, defendant offers no explanation for the three-month delay between when Hankin was first served with the complaint on June 8, 2018, and his contacting Bloom on September 5, 2018. And, Hankin then chose not to follow up with The Mallory Agency until February 11, 2019, despite not hearing any updates on the matter and being served in November 2018 with plaintiff's notice of motion for entry of a default judgment. We conclude that defendant failed to meet its burden under Jameson, and therefore, the motion court did not abuse its discretion in finding defendant did not meet the excusable neglect standard.

Defendant, as a corporation, was obligated to have a proper protocol in place to handle and respond to lawsuits. The scant evidence defendant provides of his communication with his insurance broker, which is akin to an inquiry of his agent rather than an actual notification of a pending lawsuit,

26

fails to meet the excusable neglect standard contemplated by <u>Rule</u> 4:50-1(a). No such circumstances exist here. Having determined that defendant failed to show excusable neglect, we need not address its claim of a meritorious defense. <u>Marder</u>, 84 N.J. Super. at 318.

D.  <u>The Default Judgment Is Not Void Under Rule 4:50-1(d)</u>

Defendant further contends that reversal is warranted under <u>Rule</u> 4:50-1(d), which provides for relief where "the judgment or order is void." Again, defendant reiterates its argument that because of allegedly improper service, the judgment by default should be rendered void.

We are convinced defendant has not provided an adequate explanation for its inaction. The process server attempted to serve Hankin at his home approximately ten times—Hankin avoided service by hiding and not answering the door. Plaintiff obtained an order for substituted service upon Hankin by certified mail RRR and regular mail. Hankin signed the certified mail RRR green card and did nothing to defend the action. Subsequently, Hankin refused to answer the information subpoena that was duly served upon him and could have disclosed the proper legal name of defendant to plaintiff's counsel. Hankin did not mitigate the situation. The motion court paid close attention to the timeline in this case and the inapplicability of <u>Rule</u> 4:50-1(d) in its analysis of defendant's failure to participate in the litigation.

Defendant next claims that because the entity was incorrectly named, service was improper, and relies on an eighty-five-year-old case, which is distinguishable in a number of respects. See Coventry v. Barrington, 117 N.J.L. 217 (E. & A. 1936). In Coventry, the only similarity to the present matter is the original naming of the incorrect entity; however, there the issue was the amendment to the named party occurred after the statute of limitations had run. Ibid. Here, defendant does not contend that the amendment of the party caused it any prejudice, or that the cause of action was time-barred. The identity of parties is not a rigid concept. Furthermore, Coventry was based on a motion to amend a pleading, the precursor to Rule 4:9-1, rather than with the sufficiency of service as defendant is disputing here. Saliently, there is no conflict or divergence of interests in the matter under review. See Parks v. Colonial Penn Ins. Co., 98 N.J. 42, 48 (1984). Accordingly, the Coventry case is not controlling or precedential.

E. The Motion Court Considered Relevant and Authoritative Case Law on Naming and Serving the Correct Entity

It is fundamental that service of process is essential to achieving a just outcome. The United States Supreme Court has noted "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under the circumstances, to

28

apprise interested parties of the pendency of the action and afford them the opportunity to present their objections." Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). The absence of notice violates "the most rudimentary demands of due process of law." Armstrong v. Manzo, 380 U.S. 545, 550 (1965).

We have previously held that a judgment "is absolutely void and of no legal effect for any purpose" where no service of the summons and complaint has been made on the defendant. Garza, 44 N.J. Super. at 557. Subsequently, we later reiterated this position noting "when a court is satisfied on a R[ule] 4:50-1(d) application that initial service of process was so defective that the judgment is void for want of in personam jurisdiction, the resulting void default judgment must ordinarily be set aside." Berger v. Paterson Veterans Taxi, 244 N.J. Super. 200, 205 (App. Div. 1990).

However, imperfect service has been found sufficient where a defendant had actual notice of the lawsuit prior to the entry of judgment. See Sobel v. Long Island Ent. Prods., Inc., 329 N.J. Super. 285, 293-94 (App. Div. 2000) (noting a defendant's failure to act to protect his interests within a reasonable time estopped him from obtaining relief due to technically defective service). Ultimately, sufficient notice can overcome technical imperfections because "not every defect in the manner in which process is served renders the

29

judgment upon which the action is brought void and unenforceable." Rosa v. Araujo, 260 N.J. Super. 458, 462 (App. Div. 1992). Our Court has also previously espoused a similar belief, noting "[w]here due process has been afforded a litigant, technical violations of the rule concerning service of process do not defeat the court's jurisdiction." O'Connor v. Altus, 67 N.J. 106, 127-28 (1975).

Here, the service complied with all relevant court rules, and Hankin acknowledged the existence of the lawsuit as early as June 7, 2018, when he received the complaint by certified mail. Therefore, because service of process gave sufficient notice to defendant of the lawsuit, the judgment is not void, and the motion court properly denied defendant's request for relief under Rule 4:50-1(d).

## III.

We now turn to the issue of damages awarded by the trial court to plaintiff following the proof hearing. Our focus is on whether the trial court committed plain error, that is, error "capable of producing an unjust result . . ." under Rule 2:10-2, by trebling all three categories of damages awarded under the CFA (lost wages and income, reputational damages, and infliction of emotional distress.)

Following entry of default, a plaintiff seeking unliquidated damages ordinarily is required to establish those damages at a proof hearing. R. 4:43-2(b); Chakravarti v. Pegasus Consulting Grp., Inc., 393 N.J. Super. 203, 210 (App. Div. 2007). Generally, after a default, a plaintiff is entitled to "all of the damages" that can be "prove[d] by competent, relevant evidence." Heimbach v. Mueller, 229 N.J. Super. 17, 28 (App. Div. 1988). The question on appeal is whether there was substantial evidence supporting the trial court's findings of fact and conclusions of law. Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011).

"The [CFA] provides a private cause of action to consumers who are victimized by fraudulent practices in the marketplace." Gonzalez v. Wilshire Credit Corp., 207 N.J. 557, 576 (2011). The CFA "is aimed basically at unlawful sales and advertising practices designed to induce consumers to purchase merchandise or real estate." Daaleman v. Elizabethtown Gas Co., 77 N.J. 267, 270 (1978). The statute is intended to "be applied broadly in order to accomplish its remedial purpose." Lemelledo v. Beneficial Mgmt. Corp. of Am., 150 N.J. 255, 264 (1997). It is, therefore, liberally construed in favor of the consumer. Cox v. Sears Roebuck & Co., 138 N.J. 2, 15 (1994).

To make a prima facie claim under the CFA, a plaintiff must establish three elements: "(1) unlawful conduct by defendant; (2) an ascertainable loss

31

by plaintiff; and (3) a causal relationship between the unlawful conduct and the ascertainable loss." Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 557 (2009) (citations omitted). A consumer who can prove these elements "is entitled to legal and/or equitable relief, treble damages, and reasonable attorneys' fees." Lee v. Carter-Reed Co., LLC, 203 N.J. 496, 521 (2010) (citing N.J.S.A. 56:8-19). "An 'unlawful practice' contravening the CFA may arise from (1) an affirmative act; (2) a knowing omission; or (3) a violation of an administrative regulation." Dugan v. TGI Fridays, Inc., 231 N.J. 24, 51 (2017). A plaintiff is not required to show intent where the claimed consumer-fraud violation is a regulatory violation. Ibid. To establish an ascertainable loss, plaintiff must "demonstrate a loss attributable to conduct made unlawful by the CFA." Thiedemann v. Mercedes-Benz USA, LLC, 183 N.J. 234, 246 (2005).

Importantly, "our courts have long recognized that 'non-economic damages are not recoverable under the CFA.'" DepoLink Court Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 340 (App. Div. 2013) (quoting Cole v. Laughrey Funeral Home, 376 N.J. Super. 135, 144 (App. Div. 2005)). In Cole, the plaintiffs sought to recover emotional damages that they argued were the result of the inability to have an open casket viewing at the

funeral.  376 N.J. Super. at 145.  We held those emotional damages were not recoverable under the CFA.  Ibid.

At the conclusion of the proof hearing, the trial court found plaintiff and Kawa "credible."  The trial court determined the past wage loss was $3,150,000 based upon "the exhibits" and "testimony [of] both witnesses."  We conclude the past wage loss was "'quantifiable or measurable,' not 'hypothetical or illusory.'"  D'Agostino v. Maldonado, 216 N.J. 168, 185 (2013) (quoting Thiedemann, 183 N.J. at 248).  Here, plaintiff presented uncontroverted evidence that he lost wages and income by being banned from sports and other means of earned income because he used SHED RX, which contained an illicit substance.  That is sufficient to establish an ascertainable loss within the meaning of the CFA.

As to reputational damages, the trial court noted only, "there is certainly damage to the plaintiff's reputation, especially since he's a higher profile . . . status and, along with that wage loss, being accused of something that he knowingly did not do . . . has affected him personally."  Acknowledging there was no "proof" from a psychologist or counselor, the trial court concluded plaintiff suffered from "mania" resulting in damage "at least equal to the past wage loss of [three million one-hundred-fifty-thousand dollars] and at least equal to his emotional distress" loss of another three million dollars.  The trial

33

court gave no further explanation for awarding three million dollars for reputational damage.

After reviewing the record in light of the applicable legal standards, we conclude the trial court erred in trebling the $3,000,000 award for infliction of emotional distress under the CFA because only ascertainable losses are recoverable.[6] Exercising original jurisdiction, Rule 2:10-5, we reverse and vacate the $9,000,000 award for infliction of emotional distress and remit the award to $3,000,000 for this item of damage.

Rule 1:7-4(a) requires a court "find the facts and state its conclusions of law thereon in all actions tried without a jury . . . ." "Trial judges are under a duty to make findings of fact and to state reasons in support of their conclusions." Giarusso v. Giarusso, 455 N.J. Super. 42, 53 (App. Div. 2018) (quoting Heinl v. Heinl, 287 N.J. Super. 337, 347 (App. Div. 1996)). "Meaningful appellate review is inhibited unless the judge sets forth the reasons for his or her opinion." Ibid. (quoting Strahan v. Strahan, 402 N.J. Super. 298, 310 (App. Div. 2008)). "Naked conclusions do not satisfy the purpose of [Rule] 1:7-4." Id. at 54 (quoting Curtis v. Finneran, 83 N.J. 563, 570 (1980)).

---

[6] In his supplemental brief, plaintiff concedes that his emotional distress damages cannot be trebled under the CFA.

Here, the record is unclear as to whether the trial court found plaintiff demonstrated a "causal relationship between [defendant's] unlawful conduct and [his] ascertainable loss" and reputational damage separate and distinct from his lost wages, income, and emotional distress claims because the court did not engage in that analysis. Therefore, we remand to the trial court for reconsideration of its award for reputational damages and if same are awarded, whether such damages constitute ascertainable loss under the CFA subject to trebling.

In summary, we:

> (1) affirm the motion court's order denying defendant's motion to vacate the default judgment under <u>Rule</u> 4:50-1(d);
>
> (2) affirm the trial court's judgment awarding $3,150,000 in lost wages and income to plaintiff. The trial court properly trebled this award of damages under the CFA ($3,150,000 x 3 = $9,450,000) because it constitutes an ascertainable loss;
>
> (3) affirm the trial court's judgment awarding $3,000,000 for infliction of emotional distress to plaintiff; however, reverse the trebling of this amount because there is no ascertainable loss; and
>
> (4) remand the matter to the trial court for reconsideration of its award for reputational damages. If awarded, the trial court shall determine whether such damages constitute ascertainable loss under the CFA subject to trebling.

A-0379-20

Affirmed in part, reversed and remanded in part for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0379-20